1
2
3
4
5

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

6

Yuichi Miyayama,

Case No. 2:20-cv-01683-DJA

7

                    Plaintiff,

8

          v.

**Order**

9

Steven H. Burke, as Executor of the Estate of
Noriko Hosada; et al.,

10

                    Defendants.
And related claims.

11

12     This is a tort and contract action arising out of an allegedly fraudulent real estate

13     investment scheme that Defendant Noriko Hosada—now deceased—ran with her son and

14     Defendant Steven Burke and Defendant Mont Tanner.  Plaintiff Yuichi Miyayama—a citizen of

15     Japan—sues Burke in his individual capacity; Burke in his capacity as executor for the estate of

16     his mother ("Hosada"); the Law Office of Steven H. Burke ("TLOSHB"); Tanner; and S&N

17     Investments, LLC; amongst other Defendants not relevant to the instant motions.  Miyayama sues

18     Burke, TLOSHB, and Tanner for damages, claiming—in relevant part—unjust enrichment,

19     conversion, aiding and abetting breach of fiduciary duty, legal malpractice, and fraud.  (ECF No.

20     126).  Tanner counterclaims against Miyayama for damages, claiming that, because Hosada

21     retained Tanner on Miyayama's behalf, Miyayama is liable for Tanner's unpaid attorney fees.

22     (ECF No. 127).

23     Tanner moves for partial summary judgment on certain of Miyayama's factual allegations

24     and Miyayama's unjust enrichment, conversion, and legal malpractice claims.  (ECF No. 149).

25     Tanner also moves for summary judgment on his claim for breach of contract.  (*Id.*).  Burke and

26     TLOSHB (collectively, the "Burke Defendants") move for summary judgment on Miyayama's

27     unjust enrichment, conversion, aiding and abetting breach of fiduciary duty, and legal malpractice

28     claims against them along with Miyayama's fraud claim against Burke individually.  (ECF No.

159).  Because the Court finds that neither the Burke Defendants nor Tanner have demonstrated that there are no genuine issues of material fact for trial, the Court denies both motions.

**BACKGROUND**

### I.   <u>Miyayama's allegations.</u>

This case arises out of a real estate investing arrangement between Hosada and Miyayama.  Hosada represented herself to Miyayama as a realtor, real estate broker, real property manager, agent, and fiduciary acting on behalf of real property owners and real property investors.  (ECF No. 126 at 3).  Miyayama retained Hosada to purchase various real properties located in Clark County, Nevada under his name and to rent out and manage those properties for his benefit.  (*Id.* at 4).  In exchange, Hosada retained eight percent of the rent from each property.  (*Id.*).  However, instead of using Miyayama's money to buy and manage properties, Hosada misappropriated it.  (*Id.* at 4-5).  Miyayama invested about $1,555,000.00 and Hosada purchased twenty-four properties on his behalf.  (*Id.* at 4-5, 8-10).  But, as a result of Hosada's scheme, Miyayama owns only one of the twenty-four properties and has not received his investment money back.  (*Id.*).  Hosada perpetrated this scheme by forging deeds and transferring legal title of the properties to and from entities she controlled.  (*Id.* at 8-9).  Miyayama alleges that Tanner and the Burke Defendants aided Hosada by helping with these forged deeds and fraudulent transfers, providing legal services to Hosada, and receiving Miyayama's investment money in return.  (*Id.* at 8-10).

Tanner's involvement included purportedly representing Miyayama in at least nine lawsuits related to the properties.  (*Id.* at 14-15).  These lawsuits were ostensibly to forestall or delay disclosure efforts brought by superior lien holders.  (*Id.* at 14-15).  But Miyayama ultimately lost each of the properties.  (*Id.*).

Burke's involvement included purporting to represent Miyayama in real estate matters, accepting Miyayama's investment money from Hosada, and lying to Miyayama's counsel about his knowledge and involvement in Hosada's fraud.  (*Id.* at 8-15).  In July of 2020, the Nevada Real Estate Commission issued a decision finding that Hosada had engaged in a fraudulent scheme—similar to the one Miyayama alleges—involving a different investor.  (*Id.* at 12-13).

The Commission fined Hosada $40,000.  (*Id.*).  Around that time, Burke reached out to Miyayama's attorney and represented that he did not know what happened to Miyayama's investments, that Hosada had not transferred to or hid the money with Burke, and that Burke had separated himself from his mother's business activities at some point in 2018 when Burle learned of her fraud.  (*Id.* at 13).  But Miyayama alleges that bank records prove that Burke received substantial funds from his mother—which transfers often occurred close in time to Miyayama's investments—and continued receiving money from her well into 2019.  (*Id.*).  Also contrary to Burke's statements, Burke was involved in Hosada's scheme by purporting to represent Miyayama in connection with legal proceedings stemming from the anticipated foreclosure of three properties: (1) 3640 Yorba Linda Drive, Las Vegas, NV 89122; (2) 6341 Vicuna Dr., Las Vegas, NV 89146; and (3) 28 Mallory St., Henderson, NV 89015.  (*Id.* at 13-14).  Burke also jointly owned a real estate entity with Hosada—S&N Investments, LLC—which entity was listed as a grantor on a forged deed transferring ownership of a property to Miyayama.  (*Id.* at 8-9).  Ultimately, Miyayama lost his interest in each of the three properties, having lost the Yorba Linda property to a friend of Hosada and Burke.  (*Id.* at 14-15).  But the Burke Defendants never disclosed this friendship to Miyayama.  (*Id.*).  Miyayama alleges that he never knew that either Tanner or the Burke Defendants were representing him and that he never received any retainer fee agreements from them.  (*Id.* at 13-15).

## II.   **Undisputed facts.**

The parties do not dispute Miyayama's claims about Hosada's wrongdoing.  And indeed, Hosada's estate did not answer or otherwise respond to Miyayama's complaint.  However, there are otherwise few facts which the parties do not dispute.

The parties do not dispute that Tanner and the Burke Defendants represented Miyayama in certain legal matters related to the real properties, which representations Hosada arranged.  (ECF No. 149 at 6); (ECF No. 153 at 6); (ECF No. 150 at 6); (ECF No. 157 at 4).  They also do not dispute that Miyayama executed documents assigning his son—Gen Miyayama—as his power of attorney in part for the purpose of assisting Miyayama in the real estate transactions.  (ECF No. 150 at 3); (ECF No. 157 at 4); (ECF No. 149 at 4-5); (ECF No. 153 at 6-7).  Finally, they do not

1    dispute that, in the course of representing Miyayama regarding the real properties, Tanner and the

2    Burke Defendants did not communicate directly with Miyayama. (ECF No. 149 at 5); (ECF No.

3    153 at 6); (ECF No. 150 at 15-16)[1]; (ECF No. 157 at 4).

4    **III.    Disputed facts.**

5          The parties dispute whether Hosada was acting as Miyayama's agent when she hired

6    Tanner and the Burke Defendants to represent Miyayama. Tanner and the Burke Defendants

7    assert that she was. As a result, they claim that they properly represented Miyayama, properly

8    accepted portions of his investment funds, and fulfilled their duties of communication by

9    communicating solely with Hosada. Tanner and the Burke Defendants also assert that Miyayama

10   knew that they were representing him and knew that the homes he was buying were subject to

11   liens and therefore, the risk of loss. Ultimately, Tanner and the Burke Defendants' theory on

12   summary judgment is that because they properly acted on the correct understanding that Hosada

13   was Miyayama's agent, there are no genuine issues of material fact remaining for trial on

14   Miyayama's claims against them.

15                                **LEGAL STANDARD**

16         Summary judgment is appropriate when the pleadings and admissible evidence "show that

17   there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

18   matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P.

19   56(c)). "By its very terms, this standard provides that the mere existence of some alleged factual

20   dispute between the parties will not defeat an otherwise properly supported motion for summary

21   judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty*

22   *Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A fact is material if it could affect the outcome of the

23   case. *Id*. at 249.

24

25

26   [1] Because the Burke Defendants did not comply with Local Rule 56-1, as discussed more fully
     below, the Court derives this fact from their argument that, Miyayama "provided Mr. [sic]
27   Hosada actual authority to handle the lawsuits. This would include any communications
     regarding their status. Mr. Burke, based on that authority was not required to communicate
28   directly with Mr. Miyayama."

On summary judgment, the court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). So, the parties' burdens on an issue at trial are critical. When the party moving for summary judgment would bear the burden of proof, "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)). If it does, the burden shifts to the nonmoving party, who "must present significant probative evidence tending to support its claim or defense." *Id.* But when the moving party does not bear the burden of proof on the dispositive issues at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue. *Celotex*, 477 U.S. at 323. The movant need only defeat one element of a claim to garner summary jument on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

## DISCUSSION

### I.   Tanner's motion for partial summary judgment.

Tanner moves for partial summary judgment, arguing that there are no issues of material fact regarding certain of Miyayama's factual allegations and Miyayama's unjust enrichment, conversion, and legal malpractice claims. (ECF No. 149 at 2). Tanner also moves for summary judgment regarding his counterclaim against Miyayama for breach of the attorney fee agreement that Tanner asserts existed between them. (*Id.* at 11). Because the Court finds that there remain genuine issues of material fact regarding Miyayama's claims against Tanner and Tanner's counterclaim against Miyayama, it denies Tanner's motion for partial summary judgment.

### A.   *Hosada's agency relationship with Miyayama and Tanner.*

Tanner's motion is largely premised on his theory that, because Hosada was acting as Miyayama's agent when she hired Tanner, Tanner appropriately received portions of Miyayama's investments, Tanner fulfilled his duty of communicating with Miyayama through his communications with Hosada, and Miyayama is liable for Tanner's unpaid legal fees. (ECF No.

149).  This theory underpins Tanner's motion for summary judgment on each of Miyayama's claims and on Tanner's own claim.  So, the Court addresses it first.

"Generally, the existence of an agency is a question of fact."  *Simmons Self-Storage v. Rib Roof, Inc.*, 331 P.3d 850, 856 (Nev. 2014).  "To bind a principal, an agent must have actual authority ... or apparent authority."  *Dixon v. Thatcher*, 742 P.2d 1029, 1031 (Nev. 1987); *Simmons Self-Storage*, 331 P.3d at 856.  In *Simmons*, the Nevada Supreme Court expressly adopted the Restatement's definition of actual authority, that  "[a]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."  *Simmons*, 331 P.3d at 856 (quoting Restatement (Third) of Agency § 2.01 (2006)).  When examining whether actual authority exists, Nevada courts focus on an agent's reasonable belief.  Restatement (Third) of Agency § 2.02 & cmt. e ("Whether an agent's belief is reasonable is determined from the viewpoint of a reasonable person in the agent's situation under all of the circumstances of which the agent has notice.").  Apparent authority, on the other hand, is "that authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to estop the principal from denying its existence."  *Simmons*, 331 P.3d at 857.

Here, Tanner has not demonstrated that there is no genuine issue of material fact regarding whether Hosada was acting with actual or apparent authority when she hired Tanner.  In his complaint, Miyayama alleges that the scope of Hosada's agency was limited to purchasing real estate and renting out and managing those properties.  (ECF No. 126 at 4).  And in his response to Tanner's motion for summary judgment, Miyayama insists that the agency relationship did not include Hosada hiring legal counsel.  (ECF No. 153 at 12).

Both sides refer to competing evidence to establish the scope of Hosada's agency relationship with Miyayama.  But Tanner's evidence fails to carry his burden of showing no issue of material fact on this question.  Tanner refers to portions of Miyayama's deposition where he acknowledges that he authorized Hosada to negotiate a loan; durable powers of attorney that Miyayama signed in favor of his son, Gen Miyayama ("Gen"); Gen's deposition testimony that he

trusted Hosada's accounting of rental income; and Gen's deposition testimony that Mr. Tanner

negotiated with a bank on behalf of Miyayama and communicated through Hosada.  (ECF No.

149 at 16-24, 52, 54).  But none of this evidence proves to the Court that there are no issues of

fact regarding the existence and scope of Hosada's agency relationship with regard to hiring

Tanner as counsel for Miyayama.  And Tanner points to no evidence of an agreement between

Miyayama and Hosada that would establish that there are no questions regarding the scope of that

agency for trial.

On the other hand, in response, Miyayama has pointed to the report of his expert, John

Snow, Esq., who states:

> In his deposition testimony, Mr. Tanner implies that he had no need
> to communicate directly with Mr. Miyayama as required by the
> standard, because Ms. Hosada allegedly had a power of attorney
> given by Mr. Miyayama to act as his agent.  When pressed by
> counsel for Mr. Miyayama as to the whereabouts of this alleged
> power of attorney, Mr. Tanner appeared to hedge and could  not
> definitely say where any such document might be if it in fact existed.
> Tanner Deposition, 19:16-24:9.  I have not been provided a copy of
> any such document.  An attorney in Mr. Tanner's position had a duty
> to determine that his purported client had in fact retained him, and
> in this case that required securing an express, authorized power of
> attorney if interaction was to be done through a purported third-party
> agent like Ms. Hosada

(ECF No. 153-1 at 27).

For the first time in reply, Tanner raises evidence that supports his theory of the agency

relationship.  (ECF No. 154 at 3-4).  This includes Miyayama's testimony that expenses he

received from Hosada included certain attorney's fees, acknowledging that Hosada retained

Tanner for "litigation involved for the properties," and acknowledging that Tanner was authorized

to proceed with legal cases with respect to the subject properties.  (ECF No 154 at 3-4, 14-18).

Because it was raised for the first time in reply, Miyayama was not given the opportunity to

respond to this evidence, and the evidence is not properly before the Court.  But even if it was,

while the Court could construe the evidence in Tanner's favor, the testimony evidence is not

sufficient enough for the Court to find that there are no issues of material fact regarding whether

Hosada had actual or apparent authority to hire Tanner on Miyayama's behalf.  This is especially

true because the existence of an agency relationship is generally a question of fact and because the Court must draw all inferences in the light most favorable to the nonmoving party.

### B.     Miyayama's factual allegations.

Tanner moves for summary judgment regarding certain of Miyayama's allegations in the background section of his complaint.  (ECF No. 149 at 2).  Those allegations assert that Tanner participated with the other Defendants in a scheme to defraud Miyayama, aided and abetted Hosada in perpetrating that fraud, and furthered the scheme by fabricating and forging deeds so that Miyayama would believe he owned homes that he really did not.  (*Id.*).  Tanner argues that Miyayama has failed to produce any evidence that Tanner engaged in a fraudulent scheme and that Miyayama improperly lumps Tanner into allegations against Defendants as a whole.  (ECF No. 149 at 6-7).  But Miyayama does not allege any distinct aiding and abetting or fraud claims against Tanner.  And Tanner provides no authority that summary judgment is available or appropriate relief to dispose of background factual allegations.  The Court thus denies Tanner's motion for summary judgment on Miyayama's factual allegations.

### C.     Unjust enrichment.

The doctrine of unjust enrichment or recovery in quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another or should pay for.  *Leasepartners Corp. v. Robert L. Brooks Tr.*, 942 P.2d 182, 187 (Nev. 1997) (quoting 66 Am.Jur.2d Restitution § 11 (1973)) (internal quotation mark omitted). Tanner's argument for summary judgment is based on the premise that Hosada was acting as Miyayama's agent when she hired Tanner, so his representation of Miyayama was proper and his receipt of money in exchange for that representation was not an unjust enrichment.  (ECF No. 149 at 3, 7).  Tanner also argues that "Miyayama has produced no records showing that Tanner received any funds beyond attorney fees for representing his interests against foreclosures in the properties," and points to checks from Hosada to Tanner for retainer fee deposits as the "only bank records that pertain to [him] in this case."  (*Id.* at 7, 65-67).  Miyayama responds and points out that Tanner did not address the checks in his recital of undisputed facts and thus, the Court is

without context to consider the checks.  (ECF No. 153 at 13).  Tanner reiterates in reply that the checks are the only evidence of money he received.  (ECF No. 154 at 9).

The Court denies Tanner's motion for summary judgment on this claim.  As a preliminary matter, Tanner does not address the issue of whether there was a legal contract controlling the relationship between him and Hosada as Miyayama's agent.  This explanation is particularly absent because Tanner counterclaims against Miyayama for breaching legal services agreements between Tanner and Hosada as Miyayama's agent.  But Tanner does not even attach those agreements to his motion as evidence that there is no genuine issue of material fact regarding a legal agreement existing.  Miyayama, on the other hand, attaches those legal agreements and points out that Miyayama's signature does not appear on them, despite there being a signature line for him.  (ECF No. 153-1 at 46-76).  Indeed, on each of those agreements, Hosada—signing as "manager"—and Tanner both signed, but left the signature line for "client"—Miyayama—blank.  (*Id.* at 46-55, 64-67, 71-72).  And other than his assertion that Hosada was Miyayama's agent, as outlined above, Tanner has pointed to no evidence actually establishing that Hosada was authorized to enter into legal service agreements on Miyayama's behalf.

Additionally, Tanner's reference to checks that Hosada sent him does nothing to demonstrate that no genuine issue of material fact exists regarding whether he was unjustly enriched.  As Miyayama points out, Tanner does not provide any context for these checks or reference them in his statement of undisputed facts.  (ECF No. 153 at 13).  And Tanner does not address Miyayama's allegation that Tanner was unjustly enriched because Hosada paid his legal fees out of Miyayama's investment money.  There remain genuine issues of material fact regarding whether there was a legal contract between Tanner and Miyayama, whether Tanner received portions of Miyayama's investment funds, and whether it is just for Tanner to retain that money under the circumstances.  The Court thus denies Tanner's motion for summary judgment on Miyayama's claim of unjust enrichment.

**D.     Conversion.**

Under Nevada law, conversion is defined as "a distinct act of dominion wrongfully extended over another's personal property in denial of, or inconsistent with[,] his title or rights

therein or in derogation, exclusion, or defiance of such title or rights." *M.C. Multi-Family Dev.,*
*LLC v. Crestdale Assocs., Ltd.*, 193 P.3d 536, 542-43 (Nev. 2008) (quotation and emphasis
omitted).  Conversion "is an act of general intent, which does not require wrongful intent and is
not excused by care, good faith, or lack of knowledge." *Id.* (quotation omitted).  Tanner argues
that there is no genuine dispute of material fact regarding this claim because "[Miyayama] has
produced no evidence or documentation that Tanner did anything except represent his interests in
defending foreclosure sales."  (ECF No. 149 at 7-8).   However, other than making this statement,
Tanner has not pointed to any evidence demonstrating that there is no genuine issue of material
fact regarding this claim.  To the contrary, there is evidence that Hosada made checks out to
Tanner.  (ECF No. 149 at 65-67).  And although Tanner points to portions of Miyayama's
testimony in reply that Miyayama might have intended Hosada to make those checks, Tanner
improperly raised that evidence in reply.  There thus exist genuine issues of material fact
regarding whether the money Hosada sent Tanner came from Miyayama's investments and
whether Miyayama intended Hosada to use that money to retain Tanner's legal services.  The
Court denies Tanner's motion for summary judgment regarding Miyayama's conversion claim.

### E.   *Legal malpractice.*

Miyayama brings a legal malpractice claim against Tanner in the alternative to the unjust
enrichment and conversion claims.  In Nevada, "legal malpractice is premised upon an attorney-
client relationship, a duty owed to the client by the attorney, breach of that duty, and the breach as
proximate cause of the client's damages." *Semenza v. Nev. Med. Liab. Ins. Co.*, 765 P.2d 184,
185 (Nev. 1988).  Specifically, in a legal malpractice claim, a plaintiff must "demonstrate actual
loss or damage resulting from the attorney's alleged misconduct." *See Gustafson v. Schwartz*,
No. 2:3-cv-02197-RCJ, 2015 WL 557066, at *4 (D. Nev. Feb. 11, 2015) (citing *Day v. Zubel*, 922
P.2d 536, 538 (Nev. 1996)).

In his motion, Tanner does not dispute that he formed an attorney client relationship with
Miyayama.  (ECF No. 149 at 8).  As a result, the only elements at issue are breach and causation.
Tanner points to Gen's deposition, durable powers of attorney in which Miyayama appointed Gen
as attorney-in-fact, and settlement agreements that Gen signed on Miyayama's behalf as proof

that no genuine issue of material fact exists regarding Tanner's fulfilment of his duty to communicate to Miyayama.  (*Id.* at 8, 16-50, 57-58, 60).  Tanner asserts that he fulfilled his duty by communicating through Miyayama's agent, Hosada.  (*Id.* at 8).  But as outlined above, he has not established that there are no genuine issues of material fact for trial regarding that agency relationship.  And while Tanner points to portions of Gen's lay testimony that "we are completely relying on [Hosada's] communication," and that Gen would communicate with Hosada on his father's behalf, that evidence does not establish whether Tanner breached his duty by relying solely on Hosada to communicate with Miyayama.  (ECF No. 149 at 57-58, 60).  Neither do the powers of attorney through which Miyayama appointed Gen as his attorney-in-fact or the settlement agreements that Gen signed on Miyayama's behalf acknowledging Tanner as Miyayama's attorney.  (*Id.* at 26-50).  Instead, this evidence simply demonstrates Gen's lay understanding of the arrangement.

Tanner's evidence is especially thin in light of the report of John Snow, Miyayama's retained expert, which asserted:

> Mr. Tanner simply did not pursue any verification that Miyayama was, in fact, in the loop on these cases in which he was purporting to represent his interests.  The facts of this case demonstrate that Mr. Miyayama was unaware of the nature of the properties he had purchased, and that Mr. Tanner had represented his interests regarding these properties for years, dating back to 2014.  At the same time, Mr. Tanner never informed Mr. Miyayama that the properties he had purchased were in danger of imminent foreclosure. Mr. Tanner failed to show how he could be justified in expecting a property owner to pay legal fees in order to stop foreclosure proceedings while expecting to profit from these rental properties without possessing this knowledge—knowledge that Mr. Tanner, as Mr. Miyayama's attorney, should have imparted.  In my opinion, these failures by Mr. Tanner to communicate with Mr. Miyayama constituted a breach of a lawyer's duty to keep his or her client reasonably informed of matters on which he or she is providing representation.

(ECF No. 153-1 at 27).

And Tanner's reliance—again for the first time in reply—on the report of his own expert, Joel Skelik, Esq., is confusing and fails to establish that there is no genuine issue of material fact regarding whether Tanner breached his duty to communicate:

> Plaintiff lived in Japan and did not read, write, or speak the English language. The only possible way for Mr. Tanner to communicate with Plaintiff was through another person. This may have been one of the reasons that Miyayama used Hosada as his agent. Absent this agency, and as Miyayama only hired Tanner through an agent (with no limitation of authority), no attorney-client relationship existed between Plaintiff and Tanner. Tanner Satisfied [sic] his duty to communicate by communicating with Plaintiff's Agent.[2]

(ECF No. 154 at 28).

Indeed, Tanner ignores the portion of his own expert's opinion in which his expert stated that "Snow does not indicate any reason why it was improper for Tanner to communicate with Miyayama's lawfully appointed and admitted agent, *under a lawful power of attorney*." (ECF No. 154 at 24). But as Snow specifically explained in his report, Tanner "could not definitely say where any such [power of attorney] might be if it in fact existed." (ECF No. 153-1 at 27). And neither side has provided one as evidence. Ultimately, there remains a genuine issue of material fact regarding whether Tanner breached his duty to Miyayama by failing to communicate directly with him and whether that breach was the cause of Miyayama's damages. The Court thus denies Tanner's motion for summary judgment on Miyayama's legal malpractice claim.

### F.     *Tanner's counterclaim for breach of contract.*

To prevail on a breach-of-contract claim under Nevada law, the plaintiff must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. *Richardson*, 1 Nev. 405, 408 (Nev. 1865). In support of his argument that the Court should grant summary judgment on his claim for breach of contract, Tanner points to his affidavit as evidence that Hosada was Miyayama's agent and had authority to retain Tanner's legal services for foreclosure defense litigation. (ECF No. 149 at 11). Tanner also references—but

---

[2] Tanner fails to address the confusing nature of this excerpt, which at once states that Miyayama had no attorney client relationship with Tanner but that Tanner fulfilled the duty to communicate created by that relationship.

does not attach—billing statements that he purportedly "provided…to Miyayama, through his de facto agent Hosada." (*Id.* at 12).  Tanner thus argues that there is no dispute of fact regarding Hosada's capability of binding Miyayama to a contractual agreement to pay Tanner attorneys fees in connection with his work on the foreclosing properties.

Miyayama points out the fact that Tanner does not attach the documents he asserts support his claim to the motion for summary judgment.  (ECF No. 153 at 15-16).  Miyayama adds that Tanner has not overcome the genuine and disputed issue of the extent of Hosada's agency and whether that entailed the ability to enter into legal agreements on Miyayama's behalf.  (*Id.*). Miyayama also points out that Tanner's claims to certain of the funds he asserts are due under the legal services agreements he references may be time barred because Tanner started working on several cases in 2014 and 2015.  (*Id.*).  For the first time in reply, Tanner points to portions of Miyayama's deposition in which Miyayama acknowledged that "Tanner was authorized to proceed with the legal case with respect to [Miyayama's] properties through his interactions with Ms. Hosada."  (ECF No. 154 at 18).

As discussed above, there remain genuine issues of material fact regarding whether Hosada was acting as Miyayama's agent—and whether Tanner properly confirmed that fact— when Hosada hired Tanner.  There is thus a genuine issue of material fact regarding whether Hosada was capable of binding Miyayama to a legal services agreement.  Indeed, the legal services agreements are not even signed by Miyayama, even though there is a space for him to do so.  (ECF No. 153-1 at 46-55, 64-67, 71-72).  The Court denies Tanner's motion for summary judgment on his breach of contract counterclaim against Miyayama.

## II.    <u>The Burke Defendants' motion for summary judgment.</u>

The Burke Defendants move for summary judgment, arguing that there are no issues of material fact regarding Miyayama's unjust enrichment, conversion, aiding and abetting breach of fiduciary duty, and legal malpractice against them and Miyayama's fraud claim against Burke.[3]

---

[3] The two also purport to bring their summary judgment motion on behalf of Burke in his capacity as executor of Hosada's estate.  (*Id.*).  But as Miyayama points out in response, a clerk's entry of default was entered as to Burke in his capacity as estate executor.  (ECF No. 157 at 9); (ECF No.

1   (ECF No. 150).  As a preliminary matter, and as Miyayama points out in response, the Burke

2   Defendants' motion does not comply with Local Rule 56-1 because it does not "include a concise

3   statement setting forth each fact material to the disposition of the motion that the party claims is

4   or is not genuinely in issue, citing the particular portions of any pleading, affidavit, deposition,

5   interrogatory, answer, admission, or other evidence on which the party replies."  LR 56-1; (ECF

6   No. 157 at 2).  Nonetheless, the Court still considers the Burke Defendants' motion and finds that

7   they have not established that there are no genuine issues of material fact regarding Miyayama's

8   claims.  It thus denies their motion for summary judgment.

9          **A.    *Unjust enrichment.***

10         The Burke Defendants argue that Miyayama has not produced sufficient evidence to

11   support his claim that they received Miyayama's investment funds and cannot justifiably retain

12   them.  (ECF No. 150 at 5, 22).  The Burke Defendants assert that Miyayama has not provided an

13   accounting of the funds that Miyayama alleges Hosada paid to them.[4]  (*Id.* at 5).  However, in

14   response, Miyayama points to evidence demonstrating that Burke received money from Hosada,

15   that Burke never questioned where that money came from, and that the money may have been

16   connected to Hosada's fraudulent real estate dealings.  (ECF No. 157 at 4, 24-25).

17         Miyayama references portions of Burke's deposition in which Burke testified that he

18   owned a company with Hosada—S&N Investments, LLC—from which Burke received money on

19   a regular basis, but that Burke did not question the source of those funds.  (ECF No. 157 at 5);

20   (ECF No. 157-1 at 28-29).  Miyayama points out that he named S&N as a Defendant and a

21   clerk's entry of default has since been entered against S&N.  (ECF No. 157 at 5); (ECF No. 83).

22   Burke also testified that S&N was created "to purchase and sell properties through the bankruptcy

23   auction [] in Las Vegas."  (ECF No. 157 at 6); (ECF No. 157-1 at 28-29).  Burke testified that he

24   had joint accounts with Hosada, into which accounts Miyayama transferred sums of money.

25

26   83).  The Burke Defendants withdrew their arguments regarding Burke in his capacity as executor
     in reply.  (ECF No. 159 at 10).

27
     [4] Neither the Burke Defendants nor Miyayama reference the lack-of-a-legal contract element of
28   this claim.  As a result, this element also remains a genuine issue of material fact.

(ECF No. 157 at 7); (ECF No. 157-1 at 31).  He also testified that he received large sums of money from Hosada throughout his life and that he never questioned the source of those funds.  (ECF No. 157 at 7); (ECF No. 157-1 at 31).  And Burke continued to accept money from Hosada even after learning of her fraudulent activities in January of 2018, including some of the proceeds from Hosada selling one of the homes that Miyayama alleges he paid investment funds to purchase.  (ECF No. 157 at 4, 7, 24-25); (ECF No. 157-1 at 29, 31, 32).[5]

In reply, the Burke Defendants point to an email from Hosada explaining the auction process for buying homes to Miyayama as proof that Miyayama knew that he was buying encumbered homes.[6]  (ECF No. 159 at 3, 13).  The Burke Defendants reiterate that Miyayama has not provided an accounting of the funds he and Gen gave to Hosada and that there is no proof linking those funds to the funds Hosada gave the Burke Defendants.  (ECF No. 159 at 14).

Ultimately, the Burke Defendants' arguments are not sufficient to demonstrate that there is no genuine issue of material fact regarding Miyayama's unjust enrichment claim.  The Burke Defendants' reply even admits "we do not know what funds paid to Ms. Hosada were for or whether the funds she paid to Mr. Burke were proceeds from any fraudulent scheme on her part."  (ECF No. 159 at 17).  Miyayama has provided evidence demonstrating that the Burke Defendants received money from Hosada and retained that money, some of which was from the proceeds of a property that Miyayama alleges he invested in.  And the Burke Defendants have not pointed to evidence that would establish for the purposes of summary judgment that they did not receive and retain that money unjustly.  While the Burke Defendants are correct that Miyayama has not pointed to evidence *proving* that they received Miyayama's money, Miyayama is not required to

---

[5] Miyayama also points to his initial disclosures, supplements to those initial disclosures, and his response to one of TLOSHB's requests for production of documents as proof that he produced certain accounting documents, asserting that the disclosures and his response reference the documents.  (ECF No. 157 at 8).  But Miyayama does not actually attach the documents he references.  Without more, Miyayama has only shown that he produced *something*, but not what he produced or how those documents demonstrate that a genuine issue of material fact exists.

[6] The Burke Defendants also argue that Miyayama withheld accounting documents.  However, this dispute should have been resolved through a discovery motion and the Court will not address it here.  (ECF No. 159 at 3).

1    prove his case at this stage.  Instead, he is simply required to establish that there is a genuine issue

2    for trial.  Because he has done so, the Court denies the Burke Defendants' motion for summary

3    judgment regarding the unjust enrichment claim.

4         **B.    Conversion.**

5         The Burke Defendants' arguments regarding Miyayama's conversion claim are again

6    based on their assertion that Miyayama has not produced sufficient evidence that they received

7    Miyayama's funds.  (ECF No. 150 at 23).  But as outlined above, Miyayama has pointed to

8    evidence showing that the Burke Defendants received certain funds from Hosada.  And while the

9    Burke Defendants dispute that they received the funds in derogation of Miyayama's rights over

10   them, the Burke Defendants do not point to any evidence showing that there is no genuine issue

11   for trial regarding this element.  The Court denies the Burke Defendants' motion for summary

12   judgment regarding this claim.

13        **C.    Fraud.**

14        In Nevada, fraud exists where the following five elements are established: (1) a false

15   representation made by the defendant; (2) defendant's knowledge or belief that the representation

16   is false (or insufficient basis for making the representation); (3) defendant's intention to induce

17   the plaintiff to act or to refrain from acting in reliance upon the misrepresentation; (4) plaintiff's

18   justifiable reliance upon the misrepresentation; and (5) damage to the plaintiff resulting from such

19   reliance.  *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592 (Nev. 1992).  A mere omission is

20   generally not actionable unless the defendant had a duty to disclose.  *Dow Chem. Co. v. Mahlum*,

21   970 P.2d 98, 110 (Nev. 1998) *overruled on other grounds by GES, Inc. v. Corbitt*, 21 P.3d 11

22   (Nev. 2001).  Miyayama brings his fraud claim against Burke individually, but not TLOSHB.

23   (ECF No. 126 at 20).

24        Miyayama's claim is based on his allegation that in September of 2020, Burke represented

25   to Miyayama's counsel that Burke did not know what happened to any money that Hosada took

26   from Miyayama, that Burke had "nothing to do with [Hosada's] real estate business," and that

27   Burke had separated himself and was not involved in any of Hosada's business matters after some

28   point in 2018.  (*Id.*).  Miyayama alleges that those statements were false and that Miyayama relied

1  on those statements by not seeking to amend his complaint to name Burke and TLOSHB and not

2  seeking a prejudgment writ of attachment for Burke's assets.  (*Id.* at 21).

3        Burke argues that "[n]o evidence exists to support that any discussions by and between

4  Mr. Burke and Plaintiff's counsel support a separate cause of action or have caused any damages

5  to Plaintiff."  (ECF No. 150 at 11).  Otherwise, he points to no evidence that would establish a

6  genuine issue of material fact regarding this claim.  On the other hand, Miyayama has pointed to

7  portions of Burke's deposition that seemingly contradict the statements Burke made to

8  Miyayama's counsel.  (ECF No. 157 at 26).  Indeed, Burke testified that he had received

9  hundreds of thousands of dollars from Hosada throughout his life, that he continued to receive

10  money from her after learning of her fraudulent activities in 2018, that he received money from

11  the S&N entity he owned with her that was involved in her real estate matters, and that he never

12  asked where the money he received came from.  (ECF No 157 at 26) (ECF No. 157-1 at 28-29,

13  31-33).  In reply, Burke simply states that Miyayama's expert witness "has not undertaken any

14  investigation as to whether…any statements made by Mr. Burke to counsel for Plaintiff caused

15  any damages to Plaintiff."  (ECF No. 159 at 19).

16        The Court finds that Burke has not met his burden of showing that there are no genuine

17  issues of material fact regarding Miyayama's fraud claim.  And Miyayama has demonstrated that

18  there are material factual issues for trial.  The Court thus denies Burke's motion for summary

19  judgment regarding this claim.

20           ***D.     Aiding and abetting breach of fiduciary duty.***

21        The Nevada Supreme Court has adopted the Delaware elements for aiding and abetting a

22  breach of fiduciary duty.  *In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011).  They

23  require: (1) a fiduciary relationship exists; (2) the fiduciary breached the fiduciary relationship;

24  (3) the third party knowingly participated in the breach; and (4) the breach of the fiduciary

25  relationship resulted in damages.  *Id.*  The Burke Defendants' argument regarding this claim is

26  primarily their confusing statement that:

> the claims arises [sic] from Hosada's alleged "fraudulent scheme"
> and without any evidence or proof beyond receiving undesignated
> funds from Hosada, assume them [sic] that funds were diverted from

> Plaintiff's funds, the Burke Defendants knew that Hosada had assumed that fiduciary role, participated in the breach by knowingly receiving portions of the Plaintiff's money throughout April, July, August and September of 2018, spent the money, and in spending it assisting [sic] Ms. Hosada in the fraudulent scheme.

(ECF No. 150 at 25).

The Burke Defendants add that Miyayama has not produced evidence that they contributed to Hosada's scheme by creating fraudulent or forged deeds. (*Id.*). The Burke Defendants point to portions of Miyayama's deposition for the proposition that Miyayama also "could not recall signing specific documents despite confirming his signature when presented with a copy of it," suggesting that Miyayama may have simply forgotten that he signed the deeds which he now alleges bear forged signatures (*Id.*).

But Miyayama points out in response that there is no dispute that there was a fiduciary duty between Hosada and Miyayama because the estate of Hosada never responded to the complaint and thus did not contest that fact. (ECF No. 157 at 27). Miyayama again points to portions of Burke's deposition in which he admitted to receiving money from Hosada, continued to receive money from her even after learning of her fraudulent activities, received money from S&N, and received proceeds from the sale of the Budnick property. (ECF No. 157 at 27); (ECF No. 157-1 at 28-29, 31-33). Miyayama also points to Burke's testimony regarding his involvement in a lawsuit that concluded in the transfer of another property—the Yorba Linda property—to a friend of Hosada's, despite Miyayama's allegation that it was one of the properties that Miyayama had paid for with his investment money. (ECF No. 157 at 28); (ECF No. 157-1 at 38). Regarding the deeds, Miyayama asserts that he has produced them and references his response to TLOSHB's request for production asking for them as proof, although he does not attach the deeds themselves. (ECF No. 157 at 28); (ECF No. 157-1 at 76). In reply, the Burke Defendants state that "there is no evidence that Mr. Burke believed the source of those funds were from a fraudulent scheme undertaken by his mother, or that Burke assisted her in any such scheme." (ECF No. 159 at 19). The Burke Defendants add that Miyayama has produced no proof that Burke has falsified deeds as Miyayama alleged. (*Id.* at 20).

The Burke Defendants have not met their burden of showing that there are no genuine issues of material fact regarding this claim.  To the contrary, Miyayama has pointed to evidence that establishes that there remain genuine issues of material fact regarding whether the Burke Defendants knowingly participated in Hosada's breach of fiduciary duty.  The Court thus denies the Burke Defendants' motion for summary judgment regarding this claim.

### E.    *Legal malpractice.*

Miyayama alleges that, although he was unaware of it, the Burke Defendants formed an attorney-client relationship with him when they purportedly represented him in efforts to forestall or prevent the foreclosure of several of the subject properties.  (ECF No. 126 at 23).  Miyayama alleges that the Burke Defendants breached their duty to communicate vital case information to him or to communicate that they had even commenced litigation on his behalf.  (*Id.*).  Miyayama alleges that this prevented him from being involved in the cases to his detriment.  (*Id.*).  Miyayama alleges that this is particularly true of the Burke Defendants' involvement in the litigation over the Yorba Linda property, which litigation resulted in the property being transferred to an investor who was a friend of Burke and Hosada's.  (*Id.* at 14, 23).  But Burke did not tell Miyayama that he and Hosada knew the investor.  (*Id.* at 14-15).

The Burke Defendants admit that they had an attorney-client relationship with Miyayama, but assert that it was limited to certain matters, which matters did not include the Yorba Linda property.[7]  (ECF No. 150 at 12-13).  Regarding the Yorba Linda matter, the Burke Defendants assert—without pointing to any evidence—that their client was not Miyayama but was third party CHK Properties.  (*Id.*).  The Burke Defendants argue that they were  "not presented with any information indicating that Mr. Miyayama may have had a connection to the Yorba Linda Property until after this Lawsuit was initiated."  (*Id.*).  The Burke Defendants assert that, through

---

[7] The Burke Defendants include additional arguments regarding certain discrete matters which Burke Defendants handled on Miyayama's behalf and the quality of their representation in those matters. (ECF No. 150 at 6-7, 12-14).  But the Burke Defendants' arguments regarding these matters do not address the material issues underlying Miyayama's malpractice claim: that the Burke Defendants breached the duty to communicate.  The Court does not address the details of these arguments because they do not raise genuine *material* issues of fact.

1   the work on the Yorba Linda litigation, "[a] settlement agreement was reached wherein CHK

2   Properties, Inc. ("CHK"), was permitted to keep the Yorba Linda Property subject to certain

3   conditions." (*Id.* at 14).  Regarding Miyayama's claim that the Burke Defendants breached their

4   duty to communicate to Miyayama, the Burke Defendants rely on the argument that, because

5   Hosada was Miyayama's agent, they fulfilled their duty of communication by communicating to

6   Hosada. (*Id.* at 15).  But the Burke Defendants point to no evidence that would establish that

7   Hosada was acting as Miyayama's agent when she hired them.  The Burke Defendants also assert

8   that they had no duty to inform Miyayama of Hosada's fraud because Burke is not an expert in

9   investing or real estate investing. (*Id.* at 17).  The Burke Defendants conclude that Miyayama has

10   not produced evidence demonstrating causation or damages. (*Id.* at 18).

11        In response, Miyayama points to Burke's deposition, interrogatory responses, and a letter

12   which Burke sent to the Nevada State Bar regarding Hosada's fraud, as evidence that the Burke

13   Defendants learned of Hosada's fraudulent real estate activities as early as January 2018, but that

14   they never disclosed this information to Miyayama in the course of representing him. (ECF No.

15   157 at 4); (ECF No. 157-1 at 30, 41, 43-46).  Miyayama points to Burke's testimony that he did

16   not have and did not try to obtain Miyayama's contact information, that he was involved in the

17   Yorba Linda lawsuit, and that he never had Miyayama or Gen sign a conflict waiver. (ECF No.

18   157 at 4-5, 7-8); (ECF No. 157-1 at 36, 38).  Miyayama also points to the opinion of his expert,

19   Snow, to show that the Burke Defendants' representation of Miyayama was not limited solely to

20   the discrete matters that the Burke Defendants describe. (ECF No. 157 at 17); (ECF No. 157-1 at

21   85).  Snow testified that,

22              Burke clearly had an attorney/client relationship with Mr.
               Miyayama at some point, and at that point, he had an obligation of
23              communication.  And to be involved when he had a conflict
               resulting from his relationship with his mother, I think he had an
24              obligation of disclosure of that conflict, get a waiver of that conflict,
               and just—and disclose then, of course, the obligation of
25              communication…

26

27              (ECF No. 157-1 at 85).

28

Miyayama also points to Snow's testimony to support the argument that Burke should have been aware of the issues surrounding Miyayama and his involvement with Hosada such that it was unacceptable for Burke to not know about Miyayama's interests in the Yorba Linda property. (ECF No. 157 at 17); (ECF No. 157-1 at 83). And regarding the Burke Defendants' assertion that Burke did not need to disclose any of his concerns regarding Hosada to Miyayama because Burke was not an expert in real estate investing, Miyayama points to Snow's testimony that Burke was obligated to inform Miyayama about his concerns by virtue of his relationship with Hosada (not necessarily by virtue of Burke's expertise). (ECF No. 157 at 19); (ECF No. 157-1 at 85). Finally, Miyayama again points to Snow's testimony that the Burke Defendants' failure to communicate appropriately with Miyayama caused damages in the form of Miyayama being unable to protect his interests while he was uninformed. (ECF No. 157 at 20-21); (ECF No. 157-2 at 81-82). Gen also testified that he made payments on Miyayama's behalf to Hosada after 2018, when Burke could have told him about Hosada's fraudulent acts. (ECF No. 157 at 21); (ECF No. 157 at 19).

In reply, the Burke Defendants argue that the deposition and report of Snow is not sufficient to support Miyayama's claim. (ECF No. 159 at 15). In support of this argument, the Burke Defendants' point to Snow's testimony stating that he would not be able to opine regarding specific monetary damages. (*Id.* at 15-16). The Burke Defendants assert that, even if they had a duty to communicate to Miyayama and breached that duty, Miyayama has not produced sufficient evidence to show causation and damages. (*Id.*).

Given the evidence to which Miyayama points, there is a genuine issue of material fact that must be decided at trial regarding Miyayama's legal malpractice claim. There remain genuine issues of material fact regarding the scope of the attorney-client relationship between the Burke Defendants and Miyayama, whether the Burke Defendants breached their duty of communication, and whether that breach caused Miyayama's damages. The Burke Defendants have not met their burden of showing that there are no triable issues of fact regarding this claim and Miyayama has met his burden of showing there are. The Court thus denies the Burke Defendants' motion for summary judgment regarding this claim.

1       **IT IS THEREFORE ORDERED** that Tanner's motion for partial summary judgment

2   (ECF No. 149) is **denied.**

3       **IT IS FURTHER ORDERED** that the Burke Defendants' motion for summary judgment

4   (ECF No. 150) is **denied.**

6       DATED: April 9, 2024

                                              _____

                                              DANIEL J. ALBREGTS

                                              UNITED STATES MAGISTRATE JUDGE