1

2

3

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

4

* * *

5

6

Yuichi Miyayama,

Case No. 2:20-cv-01683-DJA

Plaintiff,

7

**Findings of Fact, Conclusions of Law,**
**and Judgment Following Bench Trial**

v.

8

9

Steven H. Burke, as Executor of the Estate of
Noriko Hosoda, et al.

10

Defendants.

11

12          In 2013, Yuichi Miyayama, a Japanese national and businessman, decided to invest in the

13    Las Vegas real estate market.  Noriko Hosoda—a Las Vegas based real estate broker—promised

14    to use Miyayama's investment money to buy homes in his name, rent them out, and manage them

15    for his benefit.  Over their five-year investing relationship, Hosoda purported to buy twenty-four

16    homes with Miyayama's money, often asking for additional sums to save some of the homes from

17    foreclosure.  However, at the end of their investing relationship, Miyayama owned none of the

18    homes Hosoda said he did.

19          Miyayama sued Hosoda and her various business entities in September of 2020, alleging

20    that instead of using the money to invest in property or save the homes from foreclosure, Hosoda

21    often used it for her own devices, sometimes forging deeds and legal documents to make it look

22    like she used the money as intended.  But days after Miyayama filed his complaint, Hosoda

23    passed away.  Hosoda's estate and her companies did not defend against Miyayama's lawsuit and

24    Miyayama obtained a clerk's default against them.

25          After Hosoda passed away, Miyayama added her son, Steven H. Burke, and his law office,

26    The Law Office of Steven H. Burke, LLC ("TLOSHB"), to the action, alleging that Burke and

27    TLOSHB helped Hosoda defraud Miyayama.  Miyayama proceeded to a non-jury trial on four

28    claims against Burke and TLOSHB: unjust enrichment, conversion, aiding and abetting breach of

1   fiduciary duty, and legal malpractice.[1]  At trial, Miyayama advanced the theory that Hosoda sent

2   much of Miyayama's money to Burke and TLOSHB, which Burke then frittered away, and that

3   unbeknownst to Miyayama, Burke and TLOSHB represented Miyayama in unsuccessful legal

4   actions related to the investment properties.

5          Based on the testimony of four witnesses and voluminous exhibits, the Court finds that

6   Miyayama has prevailed on his claims for unjust enrichment, conversion, and legal malpractice

7   against Burke and TLOSHB.  However, Miyayama's damages evidence is too thin for the Court

8   to calculate compensatory damages, so the Court awards Miyayama only nominal damages on his

9   claims.  But the Court assesses punitive damages against Burke and TLOSHB.  Additionally, the

10  Court denies Burke and TLOSHB's Federal Rule of Civil Procedure 52(c) motion that they

11  brought on the last day of trial as moot because the Court finds that Miyayama has not met the

12  lower, Nevada standard for assessing damages.  The Court reaches these conclusions based on the

13  following findings of fact and conclusions of law.

14                                      **Findings of Fact**

15         In 2013, upon the advice of an investment company, Miyayama decided to invest in

16  United States-based real estate.[2]  Miyayama settled on the Las Vegas market because his son—

17  Futoshi Miyayama—lived in Las Vegas at the time.[3]  Futoshi introduced Miyayama to Hosoda, a

18  real estate broker.[4]  And in February of 2014, Miyayama sent his first round of investment funds

19  to Hosoda.[5]

20         Throughout this case, and at trial, the details of Miyayama's investing relationship with

21  Hosoda have remained largely unclear.  Miyayama admitted that he entered into a formal

22

23

24  [1] Miyayama also proceeded to the non-jury trial on a claim for fraud against Burke and TLOSHB,
    but abandoned that claim in his trial brief.

25  [2] ECF No. 215 (Miyayama's trial testimony) at 28:8-13, 47:21-24.

26  [3] Exhibit S-12 (Miyayama's deposition testimony) at 17:19-18:4.

27  [4] Exhibit S-12 at 17:19-18:4; ECF No. 169 (joint pretrial order) at 5.

28  [5] ECF No. 215 at 28:22-25.

agreement with Hosoda, but did not produce that agreement in evidence.[6]  Miyayama also

admitted that Hosoda would periodically send him a report outlining the income generated from

the properties and the expenses on which Hosoda spent Miyayama's money.[7]  But he did not

produce that either.[8]  And Miyayama's testimony regarding whether and how much money he

received in return on his investments was also inconsistent at trial and in his deposition.[9]

Miyayama also did not submit his tax documents into evidence, which would have shown any

income he received from his investments.[10]  Likely because he obtained a default against

Hosoda's estate and business entities,[11] Miyayama did not focus on his relationship with Hosoda

---

[6] ECF No. 215 at 85:11-14.

[7] *Id.* at 82:1-6.

[8] *Id.* at 82:1-20.

[9] *Compare id.* at 86:12-23 (Miyayama's trial testimony) ("Q. And my question is, did you actually receive $2,000 per month from Misty Harbour in 2014?...A. They're talking about these - - this $2,000.  It is true that I have never received any fund, any money, from her, Noriko, from Noriko.  Q. And when Misty Harbour was sold, did you receive $500,000 for Misty Harbour?  A. No, I didn't."); *with id.* at 90:24-91:11 ("Q. You testified that you sold Misty Harbour.  Are there any purchase agreement transactions, any written documentation, evidencing the sale of Misty Harbour?  A. I thought there was, but I don't remember.  Q. Do you remember how much you sold it for?  A. I bought $800,000.  I put my own money, half million dollars and the 300,000 that is owner financed, and I sold this property less than $700,000.  But during that time, a couple of years, I collected the rent, so to add the rent to the money we sold, I don't think we have lost so much money.  Q. So you're saying -- your testimony is that you didn't lose any money on that property?  A. No, I don't think I lost any money.") *with id* at 91:22-24 ("Q. Mr. Miyayama, to be clear, did you ever receive any money back from Misty Harbour's sale?  A. No.  No, we didn't receive any money.") *with* Exhibit S-12 (Miyayama's deposition testimony) at 56:5-14 ("Q. And then in the email above, you thank her for the rent.  Do you see that?  A. Yes, I can see it.  Q. Does that refresh your recollection at all that Mr. [sic] Hosoda ever turned over rent monies directly to you?  A. So this is what she come up just for the paper purpose.  Actual money, I never received from her.  So under her management, she manage all the rent.  And even she said here that the -- she would send me that October rent.  However, it is within the paperwork under her management, so I never see the money or received the money from her.").

[10] ECF No. 215 at 86:24-87:8 ("Q. Now, you testified under questioning from defense counsel that you gave your tax returns to your counsel.  Do you remember that?  A. What I meant is that I sent these tax documents to the tax professional in Japan.  Q. Okay.  You didn't provide them to legal counsel here in this case in the United States?  A. You know, I didn't sent that document to the attorney in the United States…").

[11] ECF No. 83 (clerk's default entered against Hosoda's estate; S&N Investments, LLC; Hosoda International Investment, LLC; and Platinum Earth, LLC); ECF No. 89 (clerk's default entered against Indian Home Program, LLC); ECF No. 100 (clerk's default entered against H&N

1  at trial.  Instead, he focused largely on Burke and TLOSHB's involvement with her real estate

2  scheme.

3      **A.    Burke's involvement in Miyayama and Hosoda's investment relationship.**

4      Burke's legal career had a rocky start.  After graduating from law school in 2010, Burke

5  applied to the Hawaii state bar.[12]  He had to appeal the bar for admission, however, because he

6  had a securities fraud charge against him on his record from when he was nineteen.[13]  The Hawaii

7  bar ultimately admitted Burke into practice and Burke opened TLOSHB as an LLC,[14] worked as

8  a solo practitioner, and was TLOSHB's sole managing member.[15]

9      Shortly thereafter, Burke began working with his mother in her investment business.  In

10  May of 2014, while Burke still lived in Hawaii and after Miyayama sent his first investment to

11  Hosoda, Hosoda and Burke created S&N Investments, LLC.[16]  Burke and Hosoda each owned

12  fifty percent of the company, which the two created to buy and sell properties at the Las Vegas

13  bankruptcy auction.[17]  Burke was S&N's registered agent, but otherwise claimed to have little

14

15

_____

16  Investments, LLC).  The Court notes that Miyayama dropped S&Z Investments, LLC from his
17  third amended complaint (ECF No. 126) and so, that defendant was terminated.

[12] ECF No. 215 (Burke's trial testimony) at 109:2-111:4.

18  [13] *Id.*

19  [14] *Id.*  Under Federal Rule of Evidence 201, a court may take judicial notice of a fact that is "not
20  subject to reasonable dispute," either "because it is generally known within the court's territorial
jurisdiction," or because it "can be accurately and readily determined from sources whose
21  accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Nevada Secretary of State
website reveals that The Law Office Of Steven H. Burke, NV Business ID NV20161748941 is a
22  domestic limited-liability company with a revoked status.  *See Law Office of Steven H. Burke,*
*L.L.C.*, SILVER FLUME, NEVADA'S BUSINESS PORTAL,
23  https://esos.nv.gov/EntitySearch/BusinessFilingHistoryOnline (last visited May 25, 2025).

24  [15] ECF No. 215 at 110:22-111:4 ("Q. Once you were admitted to the Bar in Hawaii, you practiced
as a sole practitioner, right?  A. Yes.  Q. And that was in 2012?  A. Correct.  Yes.  Q. And the
25  name of your firm was the Law Office of Steven H. Burke, right?  A. Yes."); *see Law Office of*
*Steven H. Burke, L.L.C.*, SILVER FLUME, NEVADA'S BUSINESS PORTAL,
26  https://esos.nv.gov/EntitySearch/BusinessFilingHistoryOnline (last visited May 25, 2025).

27  [16] ECF No. 215 at 133:8-16.

28  [17] *Id.* at 124:9-19, 133:8-16; Exhibit S-14 (Burke's deposition testimony) at 31:15-23.

involvement in its day-to-day operations.[18]  In 2015, Burke moved to Las Vegas.[19]  And in 2017, he began to take a more active role in Hosoda's investment business, conducting eviction proceedings and defending against foreclosures on certain properties.[20]

But Burke and TLOSHB's involvement with Hosoda and Miyayama's investments took a precarious turn as late as July 28, 2017.[21]  On that date, Burke—through TLOSHB—filed a complaint in the Eighth Judicial District Court on Miyayama's behalf, attempting to stop a foreclosure on one of Miyayama's properties, a home located at 28 Mallory Street, Henderson, Nevada 89105.[22]  But Burke did not meet with or even talk to Miyayama before filing the complaint.[23]  Burke never even asked Miyayama to execute a retainer agreement.[24]  Instead,

---

[18] Exhibit S-14 at 32:15-32:6.

[19] ECF No. 215 at 111:5-8.

[20] Exhibit S-14 at 23:14-24.

[21] This was revealed in a crucial piece of evidence, which was buried in thousands of pages of documents and to which Miyayama did not cite directly, forcing the Court to search for it. Searching through the documents was a common theme in this trial. The parties' trial briefs contained scant specific citations to evidence. Instead, both sides often referred broadly and nonspecifically to the evidence in this case. The proposed findings of fact and conclusions of law that the Court required the parties to submit were also missing citations to the trial record, forcing the Court to require the parties to re-submit those proposed findings and conclusions with record citations. Those renewed proposed findings still often discussed the evidence in the case generally and referred broadly or at times inaccurately to the record.

[22] Exhibit S-25 (Burke's Mallory Property client file) at BURKE_001303-312.

[23] ECF No. 215 at 124:21-125:20 ("Q. And you did foreclosure defense for your mother's properties in 2017, right?  A. Yes.  Q. And that was on the Mallory property, right?  A. Yes.  Q. And the Mallory property was one of the properties that was invested in by Mr. Miyayama, isn't it.  A. Yes.  Q. And, in fact, Mr. Miyayama was the party that you purported to represent on that case; isn't that right?  A. Yes.  Q. But you didn't ever have a written agreement with Mr. Miyayama to represent him, did you?  A. No.  Q. And you never told him that you were representing him, did you?  A. No.  Q. And you never took a retainer from Mr. Miyayama?  A. No.  Q. And you never consulted with Mr. Miyayama about the Mallory property litigation?  A. No.  Q. In fact, you didn't even alert Mr. Miyayama that you were representing him as counsel in a lawsuit, did you?  A. No."); Exhibit S-14 at 26:21-25 ("Q.  Did you ever enter into an engagement agreement with Mr. Miyayama?  A. No.  It was all under the direction of my mother, as I presume she was his agent as he lived in Japan.").

[24] *See* ECF No. 215 at 124:21-125:20, *supra*; and Exhibit S-14 at 26:21-25 *supra*.

Burke acted entirely at Hosoda's direction, accepting without questioning her representation that she was Miyayama's agent and so, authorized to retain Burke on his behalf. [25]

Burke's failure to communicate with Miyayama—his and TLOSHB's client—continued throughout Burke's work on the Mallory foreclosure, even after the proceeding revealed that Hosoda's actions had harmed Miyayama's investment. On November 9, 2017, the Eighth Judicial District Court judge hearing the Mallory matter signed a proposed order granting summary judgment in favor of the foreclosing party and against Miyayama. [26] Critically, that order revealed that, in June of 2014, Hosoda's company, H&N Properties, LLC, purchased the Mallory property at a bankruptcy auction. [27] One of the purchase terms obligated H&N to record the deed and order evidencing the sale within fourteen days and warned that, if H&N failed to do so, the sale would be void. [28] H&N never recorded the deed and order. [29] Despite this failure, in October of 2014, H&N transferred its interest in the Mallory property—an interest it did not own—to Miyayama. [30] As a result, the Eighth Judicial District Court found that H&N had no legal basis to transfer the Mallory property to Miyayama and so, Miyayama had no standing to challenge the foreclosure. [31] Burke's signature, as attorney for Miyayama, appears on the last page of the proposed order. [32] Burke never informed Miyayama that he had lost his investment property or that Hosoda's entity was the one responsible. [33]

---

[25] *See* ECF No. 215 at 124:21-125:20, *supra*; and Exhibit S-14 at 26:21-25, *supra*

[26] Exhibit S-25 at BURKE_001354-57.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] ECF No. 215 at 125:1-11 ("Q. And the Mallory property was one of the properties that was invested in by Mr. Miyayama, isn't it? A. Yes…Q. And you never told him you were representing him, did you? A. No."); *id.* at 126:25-127:16 ("Q. You've never spoken on the phone with Mr. Miyayama; isn't that right? A. That's correct. Q. But you have met him in person, correct? A. Yes…Q. And that was in 2018 or possibly 2019, right? A. Yes. Q. When you met Mr. Miyayama in person in 2018 or 2019, you didn't mention to him that you were

A review of Burke's client file reveals that Burke continued to represent Miyayama in other proceedings even after the ill-fated Mallory proceeding.[34]  Burke's file contains an invoice dated September 14, 2017, from TLOSHB to client Miyayama outlining work Burke performed on a matter titled "2320 Swaps Lane Eviction."[35]  Burke also testified to meeting with Miyayama at some point in 2018 or 2019 to discuss a tax matter.[36]

But throughout Burke's representation of Miyayama, Burke never discussed the discrepancies in his mother's dealings that Burke should have noticed as of November 9, 2017.

---

aware of your mother being involved in fraudulent real estate transactions in connection with her business, did you?  A. No.  Q. And that was even though you had represented him as counsel in connection with his properties?  A. With at least the Mallory property, yes.").

[34] Miyayama also premises some of his claims on work that Burke performed for properties located at 6217 Budnick Circle, Las Vegas, NV 89130; 3601 Valley Forge St., Las Vegas, NV 89110; 3640 Yorba Linda Drive, Las Vegas, NV 89122; and 6341 Vicuna Drive, Las Vegas, NV 89146.  ECF No. 215 at 128:1-25; ECF No. 214 at 13:8-18; Exhibit S-14 at 77:10-24.  Miyayama appears to assert that Burke and TLOSHB should be liable to Miyayama for work on these matters.  But Miyayama provides no evidence for this broad assertion.  While the parties agree that Hosoda represented to Miyayama that he owned these properties, Miyayama has produced no evidence showing that Burke knew that Hosoda had made that representation or that Burke/TLOSHB purported to represent *Miyayama* when performing work for these properties.  The emails related to the Budnick and Valley Forge properties are not specific enough, and Miyayama points to no other contextual evidence that would allow for the Court to draw this conclusion.  *See* Exhibit S-30.  And Burke's file reveals that Burke represented other entities—not Miyayama—when handling Yorba Linda and Vicuna.  *See* Exhibit S-27 at BURKE_001994-96 (showing Burke appearing as counsel for CHK Properties, Inc.—not Miyayama—in the Yorba Linda matter); Exhibit S-26 at BURKE_001778 (showing Burke and TLOSHB appearing as counsel for S&N Investments—not Miyayama—in the Vicuna matter).  There is also no evidence in Burke's client file or his depositions connecting Miyayama with those properties.  *See* Exhibit S-14 at 77:10-21; 78:10-17 (Burke testifying to his belief that a different investor—not Miyayama—ultimately provided sums so that CHK could settle the foreclosure of the Yorba Linda matter and receive clear title to the property); *see* Exhibit S-27 at BURKE_002088.

[35] Exhibit S-28 at BURKE_002194.

[36] ECF No. 214 at 70:25-71:7 (Burke's trial testimony) ("Q…and Mr. Miyayama expressly authorized you to write this letter; is that correct?  A. Yes.  Q. Were there any other instances where the plaintiff expressly authorized you to do legal work?  A. Not directly, no.  Q. That was - - that was the one occasion?  A. Yes."); *id* at 127:3-13 ("Q. But you have met [Miyayama] in person, correct?  A. Yes.  Q. And it was at a home that your mother was residing in?  A. Yes.  Q. And that was in 2018 or possibly 2019, right?  A. Yes.  Q. When you met Mr. Miyayama in person in 2018 or 2019, you didn't mention to him that you were aware of your mother being involved in fraudulent real estate transactions in connection with her business, did you?  A. No.").

Burke also admitted that, on January 31, 2018, he learned that Hosoda had defrauded one of her investors, Helen Hatori.[37]  He made this admission in a letter he sent the State Bar of Nevada on February 6, 2018, outlining Hosoda's fraud on Hatori.[38]  But Burke never communicated this revelation to Miyayama.[39]  And despite this knowledge, and the fact that Burke should have suspected that Hosoda's fraud was not limited to Hatori, Burke still never communicated the concerns he should have had to Miyayama and unconvincingly testified that he believed Hosoda's representations that she did not owe Miyayama any money.[40]  Instead Burke continued to represent Miyayama through TLOSHB—without ever telling Miyayama about his mother's fraud—by meeting with Miyayama sometime in 2018 or 2019[41] and sending two letters on his behalf in a tax matter in July of 2019.[42]

**B.    Miyayama sues Hosoda, her entities, Burke, and TLOSHB.**

In January of 2020, Miyayama became suspicious that Hosoda was defrauding him.[43] This was in part because his other son—Gen Miyayama, who was living in Las Vegas and working as an intern for Hosoda at the time—began to notice that Hosoda's reports to Miyayama were "a mess."[44]  Gen, who was studying real estate in Las Vegas, often acted as a liaison

---

[37] Exhibit S-18 (Burke's letter to the Nevada State Bar).

[38] *Id.*

[39] ECF No. 215 at 127:9-13.

[40] Exhibit S-14 at 64:2-19 ("Q. So you knew in 2018 that in addition to Ms. Natori [sic], there was another complainant who was alleging that they had been defrauded by your mother, correct?  A. Yes.  Q. But at that point you still didn't go out and make any effort to locate or alert any other investors in the real estate business, right?  A. The only other investor that I knew of was Mr. Miyayama and I specifically -- I'm sorry.  Q. You didn't alert him to the fact that your mother had been engaged in fraudulent activity, correct?  A. That is correct.  I don't have Mr. Miyayama's contact information.  I did specifically ask her if she owed Mr. Miyayama any money and she specifically told me no more than once.").

[41] ECF No. 215 at 127:3-13.

[42] Exhibit S-19; Exhibit S-20; ECF No. 214 at 70:11-71:7.

[43] ECF No. 215 at 45:9-14.

[44] Exhibit S-13 (Gen's deposition testimony) at 16:23-25, 19:15-24, 32:7-18, 38:21-39:25, 40:1-5.

between Hosoda and Miyayama.[45]  Gen testified that he initially trusted Hosoda's representations in her reports to Miyayama, but eventually, in 2018, began to doubt their accuracy.[46]

On September 11, 2020, Miyayama filed this lawsuit against Hosoda and her business entities.[47]  Five days later, Hosoda passed away.[48]  A few weeks later, on September 29, 2020, Burke emailed Miyayama's attorneys and made the following representations: "After I found out about my mother's alleged fraudulent activity approximately 2-years ago in other matters, I made sure to separate myself and not be involved in any of her business matters…she did not fraudulently transfer any property to me or hide any money."[49]

In conducting discovery, Miyayama obtained Hosoda's bank records, which reveal that, for years, Hosoda would transfer large amounts of money to Burke and TLOSHB from accounts into which Miyayama deposited his investment funds.[50]  These records revealed that Burke and TLOSHB continued to receive money from Hosoda even after Burke learned of her fraud in 2018.[51]  So, on August 5, 2021, Miyayama amended his complaint to name Burke and TLOSHB as defendants.[52]  On July 23, 2024, the Supreme Court of Nevada granted an order of temporary suspension against Burke, on the assertion by the Nevada State Bar that Burke had misappropriated $600,000.00 of client funds entrusted to him.[53]

---

[45] *Id.*

[46] Exhibit S-13 at 40:14-41:8, 63:10-22.

[47] ECF No. 1.  Hosoda's entities include H&N Investments, LLC; S&N Investments LLC dba N&S Investment, LLC; Indian Home Program LLC, sometimes operating as Indian Home Program LLC Series III; S&Z Investments L.L.C.; Hosoda International Investment LLC; and Platinum Earth, LLC.  Miyayama obtained a clerk's entry of default against each of these companies other than S&Z Investments, LLC.  ECF Nos. 83, 89, 100.

[48] ECF No. 19.

[49] Exhibit S-17 (Burke's emails to Miyayama's counsel) at BURKE_000003-4.

[50] *See* ECF No. 30 (Miyayama's motion to amend his complaint); *see generally* Exhibit S-42.

[51] *See* Exhibit S-42.

[52] ECF No. 34.

[53] Exhibit P-1.

1        **C.    Evidence introduced at trial.**

2        At trial, Miyayama pursued four claims against Burke and TLOSHB: unjust enrichment,

3    conversion, aiding and abetting breach of fiduciary duty, and legal malpractice.  Miyayama

4    asserts those claims based on three factual theories: (1) that Hosoda sent Burke and TLOSHB

5    much of Miyayama's investment money and that Burke and TLOSHB accepted these funds

6    without question, even after Burke claimed to have distanced himself from his mother's fraud;

7    (2) that Burke and TLOSHB represented Miyayama in certain legal proceedings without his

8    knowledge; and (3) that Burke, through TLOSHB, failed to inform Miyayama of Hosoda's

9    fraudulent actions.

10        At trial, Miyayama introduced evidence showing how and where he transferred his

11    investment money, primarily using a "demonstrative" exhibit.[54]  In Miyayama's trial brief, he

12    claims to have transferred Hosoda a total of $1,491,670.39[55] over the course of their investing

13    relationship.  These transfers fall into five categories:

14        • In 2014, Miyayama sent a total of $136,570.00 into a bank account owned jointly by

15          Hosoda and Burke.[56]  Burke testified that he did not have a debit card for this account

16          and never withdrew funds from it.[57]  He testified that his mother only added him to the

17          account as a contingency in case something happened to her.[58]

18    _____

19    [54] Exhibit S-42.  Where it could, the Court independently confirmed the amounts and transfers
     shown in the "demonstrative" exhibit by reviewing the records.  Because the "demonstrative"
20    exhibit was attorney created, as outlined below, the Court does not make any findings of fact
     regarding transfers that it could not verify on its own through the documents entered into
21    evidence.

22    [55] The Court's calculation totals $1,490,670.39.  This discrepancy comes from the fact that, in one
     transaction, Gen withdrew $50,000.00, but a corresponding counter credit to Hosoda only shows
23    up as $49,000.00.  *Compare* Exhibit S-4 at MIYAYAMA002598 (showing a $49,000.00 counter
     credit to Hosoda) *with* Exhibit S-6 at MIYAYAMA006101 (showing Gen withdrawing
24    $50,000.00).

25    [56] Exhibit S-42; Exhibit S-8 (Johoku Shinkin Bank transfers) at MIYAYAMA006117-18; Exhibit
     S-1 (Hosoda and Burke's account) at MIYAYAMA 000642-43 (showing transfers received of
26    $80,000.00 and $56,570.00).

27    [57] ECF No. 214 at 46:4-13; Exhibit S-42; ECF No. 215 at 111:5-9.

28    [58] ECF No. 214, *supra*; Exhibit S-42, *supra*; ECF No. 215, *supra*.

- Between April of 2015 and August of 2019, Miyayama wired a total of $463,100.39 directly to accounts owned by Hosoda.[59]

- Between April of 2017 and February of 2018, Miyayama wired a total of $237,899.66 to Gen.[60]  Gen testified that he withdrew $242,000.00 and gave it to Hosoda to pay for

---

[59] *See generally* Exhibit S-42; *see* Exhibit S-8 at MIYAYAMA006119 and Exhibit S-1 at MIYAYAMA001378 (showing a $49,705.91 transfer on April 2, 2015); *see* Exhibit S-8 at MIYAYAMA006120 and Exhibit S-4 at MIYAYAMA002368 (showing a $29,394.48 transfer on September 23, 2016); *see* Exhibit S-9 at MIYAYAMA00621 and Exhibit S-4 at MIYAYAMA002552 (showing a $35,000.00 transfer on April 30, 2018); *see* Exhibit S-9 at MIYAYAMA006122 and Exhibit S-4 at MIYAYAMA002564 (showing a $110,000.00 transfer on July 2, 2018); *see* Exhibit S-9 at MIYAYAMA006123 and Exhibit S-4 at MIYAYAMA002570 (showing a $60,000.00 transfer on August 14, 2018); *see* Exhibit S-7 at MIYAYAMA006110 and Exhibit S-4 at MIYAYAMA002606 (showing a $26,000.00 transfer on January 15, 2019—it appears that a wire fee was assessed because this amount shows up as $25,990.00 in Hosoda's records); *see* Exhibit S-7 at MIYAYAMA006110 and Exhibit S-4 at MIYAYAMA002614 (showing a $20,000.00 transfer on January 28, 2019—again showing a wire fee likely assessed because this amount shows up as $19,990.00 in Hosoda's records); *see* Exhibit S-7 at MIYAYAMA006111 and Exhibit S-4 at MIYAYAMA002622 (showing a $16,000.00 transfer on March 11, 2019—wire fee assessed, this amount shows up as $15,990.00 in Hosoda's records); *see* Exhibit S-7 at MIYAYAMA006112 and Exhibit S-4 at MIYAYAMA002630 (showing a $10,000.00 transfer on April 11, 2019—wire fee assessed, this amount shows up as $9,990.00 in Hosoda's records); *see* Exhibit S-7 at MIYAYAMA006113 and Exhibit S-4 at MIYAYAMA002638 (showing a $32,000.00 transfer on May 16, 2019—wire fee assessed, this amount shows up as $31,990.00 in Hosoda's records); *see* Exhibit S-7 at MIYAYAMA006114 and Exhibit S-4 at MIYAYAMA002646 (showing a $10,000.00 transfer on June 13, 2019—wire fee assessed, this amount shows up as $9,990.00 in Hosoda's records); *see* Exhibit S-7 at MIYAYAMA006115 and Exhibit S-4 at MIYAYAMA002654 (showing a $40,000.00 transfer on July 5, 2019—wire fee assessed, this amount shows up as $39,990.00 in Hosoda's records); *see* Exhibit S-7 at MIYAYAMA006115 and Exhibit S-4 at MIYAYAMA002654 (showing a $15,000.00 transfer on July 25, 2019—wire fee assessed, this amount shows up as $14,990.00 in Hosoda's records); *see* Exhibit S-7 at MIYAYAMA006116 and Exhibit S-4 at MIYAYAMA002662 (showing a $10,000.00 transfer on August 19, 2019— wire fee assessed, this amount shows up as $9,990.00 in Hosoda's records).

[60] *See generally* Exhibit S-42; Exhibit S-6 (Gen's account statements) at MIYAYAMA006052 (showing a $22,114.11 transfer to Gen on March 31, 2017); *id.* at MIYAYAMA006052 (showing a $17,801.51 transfer to Gen on April 3, 2017); *id.* at MIYAYAMA006053 (showing a $26,728.44 transfer to Gen on April 26, 2017); *id.* at MIYAYAMA006082 (showing two transfers to Gen for $26,000.00 and $43,917.44, on November 8, 2017); *id.* at MIYAYAMA006083 (showing two transfer to Gen for transfers of $26,000.00 and $43,400.00 on November 9, 2017); *id.* at MIYAYAMA006083 (showing a $4,000.00 transfer to Gen on November 10, 2017); *id.* at MIYAYAMA006089 (showing a $27,938.16 transfer to Gen on February 20, 2018).

Miyayama's investments.[61]  But Miyayama did not produce corresponding records showing that Hosoda received these funds.  And Miyayama testified that some of the money that he sent to Gen was intended for school and expenses, but that he did not keep track of how much money Gen used for expenses and how much Gen gave to Hosoda.[62]

- Between October of 2018 and December of 2018, Miyayama wired Gen a total of $112,181.55.[63]  Miyayama presented corresponding records showing that Gen then transferred Hosoda a total of $149,000.00.[64]

- Miyayama testified that, at some point, he wired Hosoda $500,000.00, but did not produce a document which would show that transaction in evidence.[65]

Miyayama also presented evidence attempting to show that Burke and TLOSHB received a substantial sum of his investment money.  This evidence falls into two categories:

---

[61] Exhibit S-6 at MIYAYAMA006053 (showing a $40,000.00 withdrawal on April 10, 2017); *id.* at MIYAYAMA006056 (showing a $30,000.00 withdrawal on May 1, 2017); *id.* at MIYAYAMA006083 (showing a $140,000.00 withdrawal on November 9, 2017); *id.* at MIYAYAMA006089 (showing a $32,000.00 withdrawal on February 20, 2018); ECF No. 215 (Gen's trial testimony) at 96:15-101:10.

[62] Exhibit S-12 at 41:16-20 ("Q. Okay.  You talked about money set to Gen for school and expenses.  Were you supporting Gen while he was a student in the U.S.?  A. Yes. Correct.  Q. Okay. So sometimes you -- when you sent money to Gen's account, it was for Gen to live; correct?  A. Right."); *id.* at 44:7-45:2 ("Q. When you would sent money to Gen to give to Ms. Hosoda, how would you keep track of what money you sent and what it was for?...A…So, there's no record or document I have.").

[63] Exhibit S-6 at MIYAYAMA006095 (showing a $9,990.00 transfer to Gen dated October 30, 2018); *see* Exhibit S-6 at MIYAYAMA006096 (showing three transfers of $25,990.00, $18,990.00, and $24,990.00 to Gen dated November 10th, 16th, and 19th of 2018); *see* Exhibit S-6 at MIYAYAMA006101 (showing a $32,221.55 transfer to Gen dated December 10, 2018).

[64] Exhibit S-4 at MIYAYAMA002592 (showing a $60,000.00 wire to Hosoda from Gen dated October 31, 2018, and a $40,000.00 wire to Hosoda from Gen dated November 23, 2018); *id.* at MIYAYAMA002598 (showing a $49,000.00 counter credit to Hosoda dated December 10, 2018—notably, this withdrawal shows up as a $50,000.00 withdrawal from Gen's account in Exhibit S-6 at MIYAYAMA006101, so the Court uses the $49,000.00 number in its calculation); ECF No. 215 at 102:17-103:25 (Gen identifying these transfers).

[65] ECF No. 215 at 60:23-61:25.

1

2

3

4

- Hosoda sent Burke and TLOSHB $101,577.93 from an account into which

    Miyayama's investment funds were commingled with deposits from other sources.[66]

---

[66] Exhibit S-4 at MIYAYAMA002369 (showing a $1,000.00 transfer to Burke dated September 9, 2016); *id.* at MIYAYAMA002370 (showing a $2,000.00 transfer to Burke dated September 26, 2016); *id.* at MIYAYAMA002553 (showing a $1,200.00 transfer to Burke dated April 25, 2018; five transfers totaling $11,420.00 to Burke dated April 30, 2018; showing a $300.00 transfer to Burke dated May 7, 2018; showing a $500.00 transfer to Burke dated May 9, 2018; showing a $1,200.00 transfer to Burke dated May 10, 2018); *id.* at MIYAYAMA002566 (showing a $207.93 transfer to Burke dated July 17, 2018; showing a $1,000.00 transfer to Burke dated July 20, 2018; showing a $1,000.00 transfer to Burke dated July 23, 2018); *id.* at MIYAYAMA002581 (showing a $1,000.00 transfer to TLOSHB dated August 28, 2018; showing a $1,000.00 transfer to Burke dated August 28, 2018); *id.* at MIYAYAMA002607 (showing two $1,000.00 transfers to Burke, a $500.00 transfer to TLOSHB, and a $1,000.00 transfer to TLOSHB, all dated December 26, 2018; showing a $1,000.00 transfer to TLOSHB dated December 31, 2018); *id.* at MIYAYAMA002608 (showing a $500.00 transfer to TLOSHB dated January 14, 2019); *see* Exhibit S-1 at MIYAYAMA00283 and Exhibit S-4 at MIYAYAMA002608 (showing a transfer from Hosoda's account ending in 7292 to another of Hosoda's accounts ending in 8627 totaling $17,000.00 dated January 15, 2019, and a check to Burke from the account ending in 8627 totaling $14,000.00 also dated January 15, 2019); *see* Exhibit S-4 at MIYAYAMA002615 (showing three transfers dated February 7th, 11th, and 19th of 2019 to Burke totaling $2,000.00; showing two transfers dated February 7th and 11th of 2019 to TLOSHB totaling $1,050.00); *id.* at MIYAYAMA002623 (showing a $1,200.00 transfer to TLOSHB dated February 27, 2019; showing a $1,000.00 transfer to Burke dated March 12, 2019; showing two transfers dated March 12th and 25th of 2019 totaling $2,800.00 to TLOSHB); *id.* at MIYAYAMA002626 (showing a $9,000.00 check to Burke dated March 11, 2019); *id.* at MIYAYAMA002632 (showing two transfers dated April 11, 2019, one for $1,000.00 to Burke and one for $1,000.00 to TLOSHB; showing a transfer of $1,000.00 to Burke dated April 12, 2019; showing two transfers dated April 15, 2019, one for $2,000.00 to TLOSHB and one for $1,000.00 to Burke); *id.* at MIYAYAMA002634 (showing a $200.00 check to Burke dated April 15, 2019); *id.* at MIYAYAMA002639 (showing a $200.00 transfer to Burke dated April 29, 2019; showing a $500.00 transfer to TLOSHB dated May 17, 2019; showing a $1,400.00 transfer to TLOSHB dated May 24, 2019); *id.* at Exhibit S-4 at MIYAYAMA002647 (showing two transfers dated May 28, 2019, one to Burke for $500.00 and one to TLOSHB for $500.00; showing two transfers dated May 29th and 30th of 2019, totaling $1,500.00 to Burke; showing a $100.00 transfer to Burke dated June 3, 2019; showing two transfers, dated June 14th and 17th of 2019, totaling $4,500.00 to Burke; showing two transfers, dated June 14th and 17th of 2019, totaling $2,000.00 to TLOSHB); *id.* at MIYAYAMA002655-56 (showing a $200.00 transfer to Burke dated July 1, 2019; showing a $5,000.00 transfer to Burke dated July 5, 2019; showing two transfers on July 8, 2018, one to TLOSHB for $2,500.00 and two to Burke for $5,000.00; showing two transfers dated July 10th and 12th of 2019, totaling $3,300.00 to TLOSHB; showing two transfers dated July 15th and 22nd of 2019, totaling $3,500.00 to Burke); *id.* at MIYAYAMA002663 (showing a $2,500.00 transfer to TLOSHB dated July 26, 2019; showing three transfers totaling $1,600.00 to Burke dated July 26, 2019; showing a $200.00 transfer to Burke dated July 29, 2019; showing two transfers dated August 8th and 19th of 2019, totaling $2,500.00 to Burke).

1    Miyayama did not produce a forensic accounting to show what portion of the funds

2    that Burke and TLOSHB received were traceable to Miyayama's investment funds.

3    Burke testified that he accepted these transfers into his and TLOSHB's accounts

4    without question, believed them to be gifts, and used the money for his own

5    purposes.[67]

6    •    Between August of 2016 and September of 2016, Hosoda transferred a total of

7    $7,000.00 from an account in which Miyayama's investment funds were commingled

8    with other deposits to an account owned by S&N.[68]  Miyayama did not present

9    evidence that Burke had access to this account or withdrew any funds from it.

10    Miyayama also did not proffer a forensic accounting to show what portion of the

11    transferred funds are traceable to Miyayama's investment funds.

12    Using this evidence, Miyayama seeks to hold Burke and TLOSHB responsible for every

13    cent that Miyayama sent Hosoda to invest over their five-year investing relationship.

14    Miyayama also introduced an expert witness—John Snow, Esq.—who Miyayama retained

15    to "review the matter and determine whether or not Mr. Burke violated any of the pertinent

16    standards of care in his relationship with Mr. Miyayama…And to determine whether or not

17    damages would have flowed from any breaches of the standard of care."[69]  At trial, Snow testified

18

19    ───────────────

[67] ECF No. 215 at 136:3-138:8  (Burke's trial testimony) ("Q. Okay.  So your testimony is that
your mother gratuitously transferred to you multiple times in a single day increments of $500
because she wanted to gift that to you as her son.  A. Yes.  Q. That's your sworn testimony to this
Court.  A. Yes.  She gifted me monies throughout the entirety of my life."); Exhibit S-14 at 33:2-
6 (Burke's deposition testimony) ("A. My mother transferred money to me on a regular basis.  I
don't know where all of the monies were derived from.  Q. Did you ask your mom?  A. No.").

[68] See Exhibit S-3 (showing the account for S&N ending in 6011); see Exhibit S-4 at
MIYAYAMA002369 (showing a $1,000.00 transfer to S&N's account dated August 26, 2016;
showing a $1,000.00 transfer to S&N's account dated September 6, 2016); id. at
MIYAYAMA002370 (showing a $2,000.00 transfer to S&N's account dated September 16,
2016; showing three transfers totaling $3,000.00 to S&N's account dated September 26, 2016).

[69] ECF No. 216 at 6:9-16.  Miyayama did not offer Snow as an expert at trial and did not
introduce Snow's qualifications or report into evidence.  Nonetheless, Miyayama's counsel
questioned Snow about his qualifications.  See id. at 3:22-6:3.  So, despite this oversight, the
Court finds that Snow is qualified under Federal Rule of Evidence 702.

that Burke breached the duties he owed to Miyayama by virtue of their attorney-client relationship in the following ways:

- Failing to obtain a waiver of the conflict between Hosoda's interests and Miyayama's.[70]

- Failing to inform Miyayama of Hosoda's fraud and to advise Miyayama against investing with Hosoda.[71]

- Failing to confirm with Miyayama directly whether Miyayama wanted Burke to represent him and instead relying on Hosoda's representations that she had authority to hire Burke on Miyayama's behalf as his agent.[72]

---

[70] ECF No. 216 at 7:16-8:9 ("[Burke] was providing legal services for both [Hosoda and Miyayama] at the same time; that in early -- at the latest, in early January of 2018 -- and that's the earliest. There are some indications that he might have known earlier, like in 2017, but at least by January of 2018 he was aware that his mother was engaged in dishonest, fraudulent acts and that he was using -- she was using the money of Mr. Miyayama inappropriately. That's one of the facts…The other facts is [sic] he never communicated his understanding or knowledge to Mr. Miyayama and he had the opportunity in person in 2020, and nothing was said to Mr. Miyayama at that time about any improprieties that he was aware of. And that's -- that's the -- those are the essential operative facts; lack of communication, conflict of interest, and then corresponding rules that are to apply to that."); *id.* at 11:2-4 ("In this instance, Mr. Burke would have had to tell Mr. Miyayama, 'Your partner is stealing from you. Will you still waive the conflict?'"); *id.* at 11:6-17 ("Q. Now, you were present in the courtroom when you heard the testimony from Mr. Burke that there was no conflict waiver that was ever sought or obtained, right? A. I heard that…Q. Okay. And is that significant to you in your analysis? A. Yes. You have to have a written waiver. It has to be -- you have to have a written waiver of conflicts, and it has to be based on informed consent."); *id.* at 17:17-18:1 ("In this instance, the mother's interests were directly adverse to Mr. Miyayama. That is a direct conflict….And then once you have the concurrent conflict of interest, you have to go through the waiver process which I already talked about.").

[71] *Id.* at 7:16-8:9, 9:23-25 ("He never discharged his duty by contacting him and telling him what is going on with his business partner."); *id.* at 14:3-5 ("[he] did not provide candid advice"); *id.* at 13:22-14:3 ("A…And I think what we've heard in trial and in deposition testimony, he had -- he had a hard time communicating with Mr. Miyayama about his mother's problems. I say 'problems' meaning everything we've been talking about. Q. Okay. And do you have an opinion as to whether Mr. Burke violated Rule 2.1? A. Oh, absolutely.").

[72] *Id.* at 15:15-23 ("Regardless of what the legal principle is and regardless to reliance on what an agent says about the scope of authority, when you're dealing with an agent, you need to verify it with the principal.").

1   Snow also testified that Burke's actions proximately and actually caused Miyayama

2   damages because Miyayama "continued to invest."[73]

3                                   **Conclusions of Law**

4   **I.      Theories of liability.**

5           **A.      Alter ego liability.**

6           As a preliminary matter, Miyayama has brought his claims against both Burke and

7   TLOSHB.  But although Miyayama named both parties, Miyayama made little attempt to

8   distinguish between the two or to explain how the Court should apportion liability.[74]  And neither

9   Burke nor TLOSHB raise the issue in their trial brief or at trial either.  This discussion, however,

10  is critical to the Court's conclusions of law, particularly with respect to Miyayama's claims of

11  legal malpractice and aiding and abetting breach of fiduciary duty.[75]  And so, the Court considers

12  the parties to have impliedly tried the issue and conducts this analysis *sua sponte*.[76]

13          Under Nevada law, a limited liability company creates a "corporate-styled liability

14  shield…"[77]  Typically, members of an LLC may not be held personally liable for the debts or

15

16

17

18  ─────────────────────

    [73] *Id.* at 23:10-17.

19  [74] Miyayama superficially argued that liability should attach to Burke individually in his trial
    brief, but did not address any of the legal standards applicable to alter ego liability.

20  [75] This is because, to support his unjust enrichment and conversion claims, Miyayama points to
    transactions where Burke *or* TLOSHB received certain of Miyayama's investment funds.  Those
21  transactions are thus distinct between Burke and TLOSHB.  However, the line between Burke
    and TLOSHB blurs when considering Miyayama's malpractice and aiding and abetting claims.
22  This is because those claims are ultimately based on distinct documents that show that Burke—
    through TLOSHB—took discrete actions.  So, even though Miyayama named both Burke and
23  TLOSHB, the Court must determine whether the corporate shield TLOSHB would typically
    provide to Burke protects him from liability for those discrete actions.  *See generally Ene v.*
24  *Graham*, 546 P.3d 1232 (Nev. 2024) (conducting an alter ego analysis even though a plaintiff
    named both an LLC and its sole member as defendants in a personal injury action).
25

26  [76] Under both Nevada and Federal Rules of Civil Procedure, "[w]hen an issue not raised by the
    pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if
27  raised in the pleadings."  Nev. R. Civ. P. 15(b)(2); Fed. R. Civ. P. 15(b)(2).

28  [77] *See Weddell v. H20, Inc.*, 271 P.3d 743, 748 (Nev. 2012).

liabilities of the company unless they acted as the LLC's alter ego.[78]  Nevada Revised Statute § 86.381 provides that "[a] member of a limited-liability company is not a proper party to proceedings by or against the company, except where the object is to enforce the member's right against or liability to the company."  A plaintiff may, however, hold a member of an LLC liable by "piercing the corporate veil."  The requirements for finding alter ego and piercing the corporate veil in Nevada are: (1) the corporation must be influenced and governed by the person asserted to be its alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice.[79]  Under the first factor, "single member LLCs structurally tend toward a finding that the LLC is 'influenced and governed by the person.'"[80]  Under the second, commingling of funds can constitute evidence of unity of interest and ownership.[81]  And under the third, "[i]t is enough if the recognition of the two entities as separate would result in an injustice."[82]

Here, the Court finds that piercing the corporate veil between TLOSHB and Burke is appropriate.  To start, TLOSHB is a limited liability company.  Of course, and again, neither Miyayama nor Burke and TLOSHB pointed to evidence at trial to prove this fact.  But, the Court can take judicial notice of public records and Nevada's public records reveal that, at least until its status was revoked, TLOSHB was indeed a limited liability company.[83]  Having established that TLOSHB is a limited liability company, the Court finds that piercing the corporate veil such that Burke is liable for actions taken by TLOSHB is appropriate.  First, TLOSHB is influenced and

---

[78] Nev. Rev. Stat. § 86.371 ("no member of manager of any limited-liability company formed under the laws of this State is individually liable for the debts or liabilities of the company"); Nev. Rev. Stat. § 78.747 ("no person other than a corporation is individually liable for a debt or liability of the corporation unless the person acts as the alter ego of the corporation").

[79] *Ecklund v. Nev. Wholesale Lumber Co.*, 562 P.2d 479, 479-80 (Nev. 1977).

[80] *Ene v. Graham*, 546 P.3d 1232, 1237 (Nev. 2024).

[81] *See id.*

[82] *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 886 (Nev. 1987).

[83] *See* Fed. R. Evid. 201.

governed by Burke, and Burke alone.  Public records indicate that Burke is the sole managing

member of TLOSHB.  And there is no evidence that TLOSHB hired any other attorneys.  To the

contrary, Burke worked as a sole practitioner, named the firm after himself, and did not include

the term "and associates" in its title.  Second, there is such a unity of interest and ownership

amongst Burke and TLOSHB that they are inseparable.  Burke is TLOSHB's namesake and

appears to have conducted all of the legal work at issue in this case in his capacity as TLOSHB's

sole practitioner.  The Nevada Bar also disciplined Burke for stealing client funds, indicating that

he conflated client funds, likely held by TLOSHB, with his own.  Third, in this circumstance,

adherence to the fiction that TLOSHB is a separate entity would promote injustice.  The facts that

Miyayama has proven in this case show that Burke operated TLOSHB, accepted money on its

behalf, and worked under its name such that it would promote injustice to hold TLOSHB, and

TLOSHB alone, responsible for those actions.  So, the Court finds that, for the purposes of the

following conclusions of law, Burke is not sheltered from liability by TLOSHB's corporate

status.  And, as outlined below, the Court further finds that Burke and TLOSHB are jointly and

severally liable for the claims Miyayama has proven against them.

## B.    Unjust enrichment.

Unjust enrichment is an equitable substitute for a contract.[84]  An unjust enrichment occurs

when a person has and retains a benefit which in equity and good conscience belongs to

another.[85]  The elements of an unjust enrichment are: (1) a benefit conferred on the defendant by

the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention

by the defendant of such benefit.[86]  For the first element, a plaintiff need not directly confer a

benefit on a defendant for the defendant to be liable for unjust enrichment.[87]  An indirect benefit

[84] *See Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).

[85] *Unionamerica Mortg. and Equity Trust v. McDonald*, 626 P.2d 1272, 1273-74 (Nev. 1981).

[86] *Id.*

[87] *Topaz Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992).

is sufficient.[88]  Miyayama must prove this claim—and each of the claims addressed herein—by a preponderance of the evidence.[89]

Here, Miyayama has presented evidence that Burke and TLOSHB were unjustly enriched when Hosoda transferred them sums of money which included Miyayama's investment funds and when Burke and TLOSHB accepted and retained that money.  Although Miyayama did not directly send money to Burke and TLOSHB, Burke and TLOSHB indirectly benefitted from Miyayama's investment funds.  As Burke testified, he accepted Hosoda's money transfers to him and TLOSHB without question and used that money for his own purposes, thereby appreciating, accepting, and retaining the benefit.

In his trial brief, Miyayama also claims that Burke was unjustly enriched when Miyayama wired funds into an account owned by both Hosoda and Burke and when Hosoda transferred Miyayama's investment funds from her account to S&N's account.  But there is no evidence to support that Burke appreciated, accepted, and retained the benefit of these funds.  While both Burke and Hosoda were named on the account into which Miyayama transferred certain of his investment funds on October 2nd and 16th of 2014, Burke testified that he did not have a debit card for the account and never withdrew funds from it.  He also testified that his mother only added him to the account as a contingency in case something happened to her.  While Burke is a less-than-credible witness, Miyayama did not point to any evidence that Burke knew about these transfers, accepted them, and retained the benefit.  And without this evidence, Miyayama does not show that Burke was unjustly enriched simply by being named on an account into which Miyayama wired certain of his funds.

The same is true of transfers that Hosoda made from her bank account into an account owned by S&N.  While Burke testified that he was a fifty percent owner of S&N, Miyayama has pointed to no evidence showing whether Burke had access to S&N's account, whether Burke ever

---

[88] *Id.*

[89] The usual standard of proof in civil litigation is preponderance of the evidence.  *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025).

withdrew or received funds from that account, or that Burke knew what money was going into and out of the account.  This evidence is particularly absent given Burke's testimony that he had little involvement in the day-to-day operations of S&N.  And Miyayama does not affirmatively prove that Burke appreciated, accepted, and retained these funds simply by showing that Burke lacks credibility.  So, Miyayama has proven his unjust enrichment claim, but only with respect to monies that Hosoda transferred to Burke and TLOSHB out of an account into which Miyayama's investment funds were commingled with other deposits.

### C.    Conversion.

Under Nevada law, conversion is defined as a distinct act of dominion that the defendant wrongfully exerts over the plaintiff's personal property, which act is in denial of or inconsistent with the plaintiff's rights to that property.[90]  Conversion is an act of "general intent," meaning that the plaintiff need not show wrongful intent and that the defendant is not excused by care, good faith, or lack of knowledge.[91]  The Nevada Supreme Court has not explicitly held whether conversion can occur accidentally, or without some form of intentional act.  But it has considered "persons found liable in conversion" to constitute "intentional tortfeasors."[92]

Here, Miyayama has presented evidence that Burke and TLOSHB exerted a distinct act of dominion over certain of Miyayama's investment funds that Hosoda transferred to Burke and TLOSHB because Burke and TLOSHB retained the funds and used them for their own purposes. Because conversion is an act of general intent, even if the Court were to find Burke's testimony that he understood these funds to be gifts to be credible, that lack of knowledge would not excuse Burke and TLOSHB.  So, Miyayama has proven that Burke and TLOSHB converted the funds

---

[90] *See Dynamic Transit v. Trans Pac. Ventures*, 291 P.3d 114, 118 (Nev. 2012).

[91] *See id.*

[92] *See Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1050 (Nev. 2000) ("We conclude that, as a matter of law, *intentional tortfeasors, including persons found liable in conversion* and persons in conspiracy with them, may not apply credit from settlements by their joint tortfeasors…in reduction of judgments against them arising from the intentional misconduct.") (emphasis added).

1    that Miyayama sent to Hosoda for investing that Hosoda then sent to Burke and TLOSHB to use

2    for their purposes.

3        However, Miyayama has not shown that Burke converted money that Miyayama wired

4    into an account owned by both Hosoda and Burke or that Miyayama wired to Hosoda that Hosoda

5    then transferred into the S&N account.  This is because Miyayama has not shown that Burke

6    committed any distinct act of dominion over these funds.  The Nevada Supreme Court has

7    indicated that conversion requires at least some form of an intentional act.  But there is no

8    evidence that Burke took any act to assert dominion over these funds.  Simply being named on

9    Hosoda's account is not a distinct act of dominion.  Neither is being part owner of S&N.  And

10   Miyayama has pointed to no evidence that would show that Burke accessed the funds in either

11   account or committed any act of dominion over them.  So, again, Miyayama has proven his

12   conversion claim, but only with respect to monies that Hosoda transferred to Burke and TLOSHB

13   out of an account in which Miyayama's investment funds were commingled with other deposits.

14        **D.      Aiding and abetting breach of fiduciary duty.**

15        Nevada law requires that plaintiffs in an aiding and abetting breach of fiduciary duty

16   action show: (1) a fiduciary relationship exists; (2) the fiduciary breached the fiduciary

17   relationship; (3) the third party knowingly participated in the breach; and (4) the breach of the

18   fiduciary relationship resulted in damages.[93]  Miyayama has proven the first and second element

19   of this claim: that he and Hosoda had a fiduciary relationship and that Hosoda breached that

20   relationship.  In their joint pretrial order, the parties agree that Hosoda was a real estate broker.

21   And under Nevada law, a real estate broker owes a fiduciary duty to those they undertake to serve

22   in a professional capacity.[94]  Additionally, although Miyayama presented very little evidence

23

24   _____

25   [93] *In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011).

26   [94] Nev. Rev. Stat. § 645.030(1)(a) (defining a "real estate broker" as a person who, "for another
     and for compensation or with the expectation of receiving compensation" "sells, exchanges,
27   options, purchases, rents or leases, or negotiates or offers, attempts or agrees to negotiate the sale,
     exchange, option, purchase, rental or lease of, or lists or solicits prospective purchasers, lessees or
28   renters of, any real estate or the improvements thereon or any modular homes, used manufactured
     homes, used mobile homes or other housing offered or conveyed with any interest in real

1    regarding his relationship with Hosoda, Miyayama obtained a clerk's entry of default against her.

2    So, the Court takes Miyayama's well pleaded allegations against her—including the allegations

3    that Hosoda breached her fiduciary duty to Miyayama by not using his money to invest in

4    properties as promised—as true.[95]

5        However, the evidence that Miyayama has introduced to show the third element—that

6    Burke and TLOSHB knowingly participated in Hosoda's breach—is far too broad.  In his trial

7    brief, Miyayama refers generally to Burke's lack of credibility, to Burke's status as fifty percent

8    owner of S&N, to Burke's failure to inform Miyayama of Hosoda's fraudulent activity, and to

9    Burke and TLOSHB's receipt of money from Hosoda, to attempt to establish this claim.  But

10   none of these general references prove, with concrete evidence, that Burke *knowingly*

11   *participated* in Hosoda's breach of her fiduciary duty.

12       Despite Miyayama's failure to point to any concrete piece of evidence showing the third

13   element, the Court found one piece of evidence—buried in thousands of pages of documents—

14   that proves the third element of this claim against Burke and TLOSHB.  The document is the

15   proposed order, signed by Burke through TLOSHB, that the Eighth Judicial District Court entered

16   on November 9, 2017.  That document shows that, at least as of November 9, 2017, Burke knew

17   that Hosoda's company had transferred Miyayama the Mallory property—a property that it never

18   owned in the first place—and that, as a result, Miyayama lost an investment property.  So, this

19   document proves that Burke knew that Hosoda had breached her fiduciary duty to Miyayama.

20   And this document proves that Burke participated in that breach by failing to inform Miyayama—

21   Burke and TLOSHB's client—that Hosoda had breached her duty to him.

22       But although this document shows that Burke and TLOSHB knowingly participated in

23   Hosoda's breach of her fiduciary duty to Miyayama, it does not prove the fourth element: that the

24

25   ───────────────

26   estate."); *Jory v. Bennight*, 542 P.2d 1400, 1403 (Nev. 1975) (explaining that a real estate broker
     "had fiduciary duties to those he had undertaken to serve in a professional capacity…").

27   [95] *Solano v. Preciado*, 738 F.Supp3d 1356, 1362 (D. Or. 2024) (citing *TeleVideo Sys., Inc. v.
     Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)); ECF No. 126 (Third Amended Complaint) at

28   4-5.

breach *resulted* in damages.  And Miyayama did not proffer sufficient evidence to prove this element.  Miyayama entered a "demonstrative" exhibit into evidence, purporting to show that on July 2, 2018—nearly a year after Miyayama had already, and unknowingly, lost the Mallory property—Miyayama sent Hosoda $110,000.00 "[f]or additional payment on the Mallory property."  But Miyayama points to no evidence that would prove he made this $110,000.00 payment "for" the Mallory property.  And the Court's review of the evidence does not prove this either.  The only piece of evidence that comes close is Gen's deposition testimony.  In his deposition, counsel showed Gen a text message dated July 2, 2018, the same date as Miyayama's $110,000.00 transfer.[96]  Counsel asked Gen why he knew that the text was related to the Mallory property, and Gen testified "I am aware that the bill was an additional investment on the date of July 2nd, 2018," and that he knew the texts were related to the Mallory property because of the date.[97]  But, critically, neither party has introduced the text messages to which Gen was referring into evidence.  Miyayama does not even reference this portion of Gen's testimony in his trial brief or the "demonstrative" exhibit.  And without more, the Court cannot find, by a preponderance of the evidence, that Miyayama's $110,000.00 transfer was "for additional payment on the Mallory property" such that he has proven that the specific breach of fiduciary duty which Burke and TLOSHB aided and abetted *resulted* in damages.  So, Miyayama has not proven his aiding and abetting breach of fiduciary duty claim.

### E.    Legal malpractice.

Nevada law requires that a plaintiff claiming legal malpractice show: (1) an attorney-client relationship; (2) a duty owed to the client by the attorney to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity possess in exercising and performing the tasks which they undertake; (3) a breach of that duty; (4) the breach being the proximate cause of the

---

[96] Exhibit S-13 at 49:3-50:14.  The Court does not reference this portion of Gen's deposition testimony in its findings of fact because Miyayama did not provide sufficient context for this testimony for the Court to make any factual findings about it.

[97] *Id.*

client's damages; and (5) actual loss or damage resulting from the negligence.[98]  An attorney-client relationship does not require that the parties execute a formal agreement.[99]  And so, "the inquiry into whether an attorney-client relationship has been established is very fact-specific."[100]  In a legal malpractice claim, a plaintiff must demonstrate actual loss or damage resulting from the attorney's alleged misconduct.[101]  An attorney's duty of loyalty to the client on matters in which he represented the client continues after the representation has otherwise ended.[102]

Miyayama made no effort in his trial brief to show when and how the attorney client relationship between Burke/TLOSHB and Miyayama formed.  And so, the Court was forced to review the evidence on its own to conduct the fact-specific analysis of determining whether Burke/TLOSHB, and Miyayama formed an attorney client relationship.  The evidence shows that Burke/TLOSHB and Miyayama entered into an attorney client relationship as early as July 28, 2017, when Burke, through TLOSHB, filed a complaint on Miyayama's behalf to forestall the Mallory foreclosure.  Burke/TLOSHB and Miyayama also formed some sort of attorney client relationship related to Burke's work on a matter titled the "2320 Swaps Lane Eviction," as evidenced by the invoice that Burke addressed to Miyayama dated September 14, 2018.  Burke/TLOSHB and Miyayama also formed an attorney client relationship when Burke wrote letters on Miyayama's behalf on July 15th and 19th of 2019, regarding a tax matter.  These pieces of evidence are sufficient to show that Burke and Miyayama entered into some form of an attorney client relationship as early as July of 2017 and extending until July of 2019.  So, this evidence establishes the first element.  The evidence also establishes the second element.  Because Burke/TLOSHB represented Miyayama in the Mallory foreclosure matter, in the Swaps Lane eviction, and in the 2019 tax matter, Burke/TLOSHB owed Miyayama a duty to use such

---

[98] *Day v. Zubel*, 922 P.2d 536, 538 (Nev. 1996).

[99] *Williams v. Waldman*, 836 P.2d 614, 618 (Nev. 1992).

[100] *Waid v. Eighth Jud. Dist. Court ex rel. County of Clark*, 119 P.3d 1219, 1223 (Nev. 2005).

[101] *See Day*, 922 P.2d at 538.

[102] *Jones v. Wirth*, No. 2:16-cv-00243-MMD-GWF, 2016 WL 4994962, at *4 (D. Nev. Sept. 16, 2016).

1    skill, prudence, and diligence as lawyers of ordinary skill and capacity possess in exercising and
2    performing these tasks.

3        However, there is not enough evidence detailing Burke/TLOSHB and Miyayama's
4    attorney client relationship with regard to the Swaps Lane eviction and the tax matter to establish
5    the fourth element that Burke/TLOSHB breached their duty to Miyayama in performing work on
6    these matters.  Miyayama has not pointed to any evidence showing that Burke failed to
7    communicate with Miyayama regarding these issues.  To the contrary, Burke testified that he met
8    in person with Miyayama to discuss the tax matter.  And although the Court can assume from
9    Burke's testimony that he did not communicate directly with Miyayama regarding the Swaps
10   Lane eviction, Miyayama has pointed to no evidence at all regarding this matter.  The only
11   evidence that the Court has regarding it is an invoice, from which the Court cannot derive a
12   breach of Burke's/TLOSHB's duty.

13       But the evidence does show that Burke/TLOSHB breached their duty to Miyayama in the
14   course of the Mallory foreclosure representation and in Burke/TLOSHB's dealings with
15   Miyayama thereafter.  Burke should have known, at the very latest on November 9, 2017, that
16   Miyayama and Hosoda's interests were adverse when he signed a document acknowledging that
17   Hosoda, through H&N, had transferred Miyayama a property that H&N never owned, resulting in
18   Miyayama losing one of his investment properties.  Burke, being a lawyer, should have
19   recognized that Miyayama could have a potential claim against Hosoda and H&N for this loss.
20   But Burke continued to represent Miyayama at Hosoda's—and only Hosoda's—behest, which
21   was a breach the attorney-client relationship.  Indeed, as Miyayama's expert credibly testified, an
22   attorney cannot ethically rely on an agent's representation that the agent has the authority to hire
23   the attorney on behalf of the principal client.  Burke also failed to obtain a conflict waiver from
24   Miyayama, which was another breach of the attorney-client relationship.  Miyayama's expert
25   credibly testified that, once an attorney recognizes a concurrent conflict of interest, the attorney
26   must seek to waive the conflict with the clients.  Additionally, even if the November 9, 2017,
27   order did not raise Burke's suspicions about his mother's fraudulent actions, Burke knew in
28   January of 2018 that his mother had been committing fraud in her real estate investment business.

Burke's testimony that he believed his mother's representations in 2018 that she did not owe Miyayama any money is undermined both by Burke's lack of credibility, and by the fact that about a year earlier, Burke acknowledged that Hosoda, through H&N, had transferred Miyayama a property H&N never owned.  And Miyayama's expert credibly testified that Burke had a duty to disclose his mother's fraud to Miyayama.  Moreover, the evidence shows that, despite knowing that his mother was committing real estate fraud, and despite the fact that Burke should have known that this fraud extended to Miyayama, Burke met with Miyayama in 2018 or 2019. Worse, he met with Miyayama to represent him in a tax matter, but still did not inform Miyayama of Hosoda's fraud despite renewing the attorney client relationship and thus renewing Burke's obligations to Miyayama.

Finally, because Burke breached his duty to Miyayama at least as of November 9, 2017, each payment that Miyayama made to Hosoda after that point could be attributable as a loss resulting from Burke/TLOSHB's breach.  Had Burke fulfilled his duties to Miyayama, Miyayama would have known that Hosoda purported to transfer him a house that she did not own.  So, Miyayama would have likely refrained from sending Hosoda any further investment money.  But because Burke/TLOSHB breached their duty to Miyayama, Miyayama continued to send Hosoda large amounts of money for nearly two more years.  So, Miyayama has proven his legal malpractice claim against Burke and TLOSHB.

## II.     Damages.

### A.     Burke and TLOSHB's Rule 52 motion.

On the last day of trial, Burke and TLOSHB moved for judgment in their favor under Federal Rule of Civil Procedure 52(c) on the issue of Miyayama's damages calculation.  In their Rule 52(c) motion, Burke and TLOSHB's counsel argued that Miyayama failed to carry his burden of proof with regard to damages, in particular because Miyayama did not prove how much money he received in return for his investments.[103]  Miyayama's counsel argued in response that

---

[103] ECF No. 216 at 45:23-48:11.

he submitted evidence regarding his damages and that Miyayama testified that he never received any money back from his investments.[104]   The Court took the motion under advisement.

Under Federal Rule of Civil Procedure 52(c), "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Rule 52(c) expressly authorizes the judge to resolve disputed issues of fact.[105]   In deciding whether to enter judgment on partial findings under Rule 52(c), the district court is not required to draw any inferences in favor of the non-moving party; rather, the district court may make findings in accordance with its own view of the evidence.[106]   Rule 52(c) "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence."[107]   The Court may grant a Rule 52(c) motion if it becomes apparent that the plaintiff has failed to carry an essential burden of proof.[108]

However, there is a discrepancy between the standard that Burke and TLOSHB ask the Court to apply under Rule 52(c) and the burden of proof that Miyayama must meet to show damages.  Although the Ninth Circuit has not opined on the issue in a published decision, courts in this circuit—including the Ninth Circuit in an unpublished decision—have decided Rule 52(c) motions by weighing evidence and resolving the case or claims at issue based on a preponderance of the evidence standard.[109]   But, under Nevada law, the plaintiff must prove the amount of its

---

[104] ECF No. 216 at 48:14-50:9.

[105] *Ritche v. U.S.*, 451 F.3d 1019, 1023 (9th Cir. 2006).

[106] *Id.*

[107] Fed. R. Civ. P. 32(c) advisory committee's note to 1991 amendment.

[108] *Price v. U.S. Navy*, 818 F.Supp.1323, 1324 (S.D. Cal. 1992).

[109] *In re Ma*, No. ADV LA 07-01907-BR, 2011 WL 3300156, at *8 (B.A.P. 9th Cir. Apr. 20, 2011) (unpublished); *see United States v. Freitas*, No. 18-cv-1259-GPC-JLB, 2020 WL 13539104, at *1 (S.D. Cal. Mar. 4, 2020) (citing *Int'l Union of Operating Eng'rs, Local Union 103 v. Indiana Constr. Corp.*, 13 F.3d 253, 257 (7th Cir. 1994)); *see Costal Environmental Rights Foundation v. Naples Restaurant Group, LLC*, No. 2:21-cv-09172-MCS-JEM, 2023 WL 8872050, at *1 (C.D. Cal. Mar. 15, 2021) (same).

1   damages with "substantial evidence,"[110] which is defined as more than a mere scintilla, but less

2   than a preponderance.[111]

3         Although Burke and TLOSHB raised their arguments at trial, they did not discuss this

4   motion in their trial brief.  As a result, they also failed to address the discrepancy between the

5   standards of proof that courts apply in deciding Rule 52(c) motions and in deciding damages

6   under Nevada law.  Nonetheless, even if Burke and TLOSHB did not raise their Rule 52(c)

7   motion, as outlined below, the Court still would have found that Miyayama did not prove the

8   amount of his damages by substantial evidence, an even lower standard than the Rule 52(c)

9   preponderance standard.  So, because the Court finds that Miyayama did not meet the lower

10  standard, the Court denies Burke and TLOSHB's Rule 52(c) motion as moot.

11        **B.**      **Compensatory damages.**

12        As outlined above, under Nevada law, the plaintiff must prove the amount of its damages

13  with "substantial evidence,"[112] that is, the plaintiff must provide an "evidentiary basis for

14  determining a reasonably accurate amount of damages."[113]  Though the calculation of damages

15  "need not be proven with mathematical certainty, testimony on the amount may not be

16  speculative."[114]  If the plaintiff "prove[s] a right to damages without proving the amount," the

17  plaintiff is entitled to nominal damages only.[115]

18        Here, Miyayama has proven that he is entitled to damages for his unjust enrichment,

19  conversion, and legal malpractice claims against Burke and TLOSHB.  He has not, however,

20  proven the amount of his compensatory damages for his claims under the substantial evidence

21  standard.  Regarding Miyayama's claims for unjust enrichment and conversion, even though

22  Miyayama has introduced evidence showing that he sent money to Hosoda, who then sent

23

24  [110] *Alper v. Stillings*, 389 P.2d 239, 240 (Nev. 1964).

25  [111] *Ferguson v. O'Malley*, 95 F.4th 1194, 1199 (9th Cir. 2024).

    [112] *Alper*, 389 P.2d at 240.

26  [113] *Mort Wallin of Lake Tahoe, Inc. v. Com. Cabinet Co.*, 784 P.2d 954, 955 (Nev. 1989).

27  [114] *Clark Cnty. Sch. Dist. v. Richardson Const., Inc.*, 168 P.3d 87, 97 (Nev. 2007).

28  [115] *Alper*, 389 P.2d at 240.

portions of that money to Burke and TLOSHB, Miyayama has not introduced any evidence that would allow the Court to calculate those damages in a reasonably accurate way. This is because Hosoda sent Burke and TLOSHB funds from an account in which she commingled funds from Miyayama and from other sources. So, the funds Burke and TLOSHB received did not derive solely from Miyayama's investment funds. But Miyayama has provided no forensic accounting or expert testimony to aid the Court in calculating how much of the money Burke and TLOSHB received from Hosoda actually belonged to Miyayama.

Miyayama has also failed prove the amount of his damages for his legal malpractice claim by substantial evidence. Miyayama has introduced evidence showing that Burke should have informed him, at least as of November 9, 2017, of Hosoda's wrongdoing. And the Court can infer that, had Miyayama learned of Hosoda's wrongdoing, he would have ceased sending her money to invest after that date. But Miyayama has not introduced evidence that would allow the Court to calculate the actual damages attributable to Burke's legal malpractice.

As a preliminary matter, while Miyayama has pointed to certain evidence of him sending Gen $140,000.00 and $32,000.00 on November 9, 2017, and February 20, 2018, respectively, to invest with Hosoda, he has pointed to no bank statements that would show that Hosoda received those funds. So, the Court is forced to rely only on Gen's testimony that he withdrew those amounts and provided them to Hosoda. But Gen made these transactions many years before he testified to them and, given the fact that he received funds from Miyayama for other purposes as well, it is possible that Gen did not give the entire amount to Hosoda. So, the Court cannot count these amounts into its calculation.

Additionally, with regard to the amounts Miyayama sent Hosoda after November 9, 2017, for which Miyayama did reference bank statements, Miyayama has not shown that those amounts are his actual damages. This is because Miyayama provided conflicting testimony about whether and when he received any return on his investment and did not provide his tax returns to prove that he did not. If Miyayama ever received a return on his investments, the damages that Burke's legal malpractice actually caused would be reduced.

1    But even if the Court were to attribute Miyayama's conflicting statements to translation

2 issues or to confusion, unanswered questions prevent the Court from attributing one hundred

3 percent of the funds that Miyayama sent to Hosoda after November 9, 2017, to Burke and

4 TLOSHB.  For example, how much of the money that Miyayama sent Hosoda actually went to

5 legitimate purposes like maintaining the properties?  How much did Hosoda retain as her

6 compensation?  How much money legitimately went towards legal endeavors to prevent those

7 properties from falling into foreclosure?  Miyayama did not produce the accounting that Hosoda

8 provided to him—and that he acknowledged existed—or any other evidence, that could have

9 potentially answered these questions.  And the Court cannot simply subtract the amount that

10 Burke and TLOSHB received from the amount Miyayama sent Hosoda because, again, the Court

11 has no accounting to determine how much of that money was Miyayama's.  Because Miyayama

12 has not introduced evidence that would allow the Court to calculate his damages, and because

13 Miyayama's testimony on the matter is inconsistent and therefore speculative, Miyayama has not

14 met his burden of providing an evidentiary basis for determining a reasonably accurate amount of

15 damages.  So, the Court awards him nominal damages for his claims of unjust enrichment,

16 conversion, and legal malpractice, jointly and severally,[116] against Burke and TLOSHB totaling

17 $1.

18    **C.    Punitive damages.**

19    Although Miyayama has not shown the substantial evidence necessary for the Court to

20 calculate his compensatory damages, he has shown by clear and convincing evidence that he is

21 entitled to punitive damages.  Punitive damages are available if "the plaintiff proves by clear and

22 convincing evidence that the defendant is guilty of oppression, fraud or malice, express or

23 implied."[117]  To be clear and convincing, evidence "need not possess such a degree of force as to

---

[116] "A creature of tort law, joint and several liability applies when there has been a judgment against multiple defendants." *Honeycutt v. United States*, 581 U.S. 443, 447 (2017) (internal citations and quotations omitted).  "If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount." *Id.* (citing the Restatement (Second) of Torts § 875 (1977)).

[117] *Garcia v. Awerbach*, 463 P.3d 461, 464 (Nev. 2020).

be irresistible, but there must be evidence of tangible facts from which a legitimate inference may be drawn."[118]  Implied malice is "despicable conduct which is engaged in with a conscious disregard of the rights of others.[119]  A defendant acts with conscious disregard when he has "knowledge of the probable harmful consequences of a wrongful act and willfully and deliberately fails to act to avoid those consequences."[120]  "[T]o justify punitive damages, the defendant's conduct must have *exceeded* mere recklessness or gross negligence."[121]

Punitive damages are designed not to compensate the plaintiff for harm suffered but, instead, to punish and deter the defendant's culpable conduct.[122]  To protect against grossly excessive or arbitrary awards, the United States Supreme Court has fashioned, and the Nevada Supreme Court has adopted, three guideposts for deciding when a punitive damage award has violated due process: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the punitive damage award to the actual harm inflicted on the plaintiff; and (3) how the punitive damages award compares to other civil or criminal penalties that could be imposed for comparable misconduct.[123]  The first guidepost is the most important.[124]  The Ninth Circuit has found that the second guidepost is irrelevant in cases where a plaintiff is awarded only nominal damages.[125]  And in analyzing the third, the Nevada statutory cap on punitive damages is relevant and, specifies that, if a compensatory damages award is less than $100,000.00, punitive damages are capped at $300,000.00.[126]

---

[118] *Matter of Discipline of Arabia*, 495 P.3d 1103, 1112 (Nev. 2021).

[119] *Bongiovi v. Sullivan*, 138 P.3d 433, 451 (Nev. 2006) (internal citations omitted) (cleaned up).

[120] *Garcia*, 463 P.3d at 464 (cleaned up).

[121] *Id.* (emphasis in original).

[122] *Bongiovi*, 138 P.3d at 450.

[123] *Id.* at 452 (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

[124] *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1054 (9th Cir. 2014).

[125] *Id.* at 1058.

[126] Nev. Rev. Stat. § 42.005; *see Wyeth v. Rowatt*, 244 P.3d 765, 785 (Nev. 2010) (considering Nev. Rev. Stat. § 42.005 in determining the third guidepost).

Here, Miyayama has proven by clear and convincing evidence that Burke and TLOSHB are guilty of implied malice. Miyayama has proffered evidence showing that, at least as of November 9, 2017, Burke knew that his mother's entity had transferred Miyayama a house that it did not own, which unrealized transfer cost Miyayama one of his investment properties. Despite knowing this, Burke failed to warn Miyayama against investing with Hosoda and continued to represent[127] Miyayama in other matters, showing a conscious disregard for Miyayama's rights. Indeed, Burke was a lawyer and so should have known of the probable harmful consequences of not informing a client that the client had lost an investment property due to the fault of his investment broker. But Burke, through TLOSHB, deliberately failed to avoid those consequences. Miyayama has also proffered evidence that Burke learned definitively that his mother was committing fraud through her investment business in January of 2018, but still failed to inform Miyayama, despite Burke/TLOSHB representing him in a tax matter. Finally, Miyayama has presented evidence that Burke and TLOSHB continued to accept payments from Hosoda, even after Burke promised to have extricated himself from her businesses. And the Court does not find Burke's explanations that he tried to contact Miyayama but failed, that he did not realize his mother's fraud extended to Miyayama, and that he did not realize that the money he received from his mother may have come from an illegitimate source, to be credible given his prior charge and disciplinary action for dishonest acts. Because punitive damages are designed not to compensate, but to punish and deter, the Court does not face the same difficulty in assessing them as it did in assessing compensatory damages. Here, the Court finds it appropriate

---

[127] The Nevada Supreme Court has not explicitly authorized awarding punitive damages for legal malpractice. But at least one court in this district has recognized that punitive damages for legal malpractice claims are not necessarily foreclosed. *See Jones v. Wirth*, No. 2:16-cv-00243-MMD-GWF, 2016 WL 4994962, at *4 (D. Nev. Sept. 16, 2016). And other courts have authorized punitive damages awards for legal malpractice claims. *See Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 30 Cal. 4th 1037, 1053 n.3 (2003) ("Of course, plaintiffs may recover punitive damages in a legal malpractice action if the attorneys *themselves*, are guilty of 'oppression, fraud, or malice…'") (emphasis in original).

1    to award punitive damages totaling $300,000.00, which represents the maximum statutory

2    amount under Nevada law when the compensatory damage award is less than $100,000.00.

3         However, to avoid any excessive or arbitrary award, the Court must still consider the first

4    and third of the United States Supreme Court and Nevada Supreme Court's guideposts.  First, the

5    Court must consider the degree of reprehensibility of Burke's conduct.  And here, as outlined

6    above, Burke and TLOSHB's conduct was sufficiently reprehensible to warrant an award of

7    $300,000.00.  This amount represents only a portion of the funds—totaling $566,000.00 on and

8    after November 9, 2017—that Burke could have and should have stopped Miyayama from

9    sending to invest.  Because the Court only awarded nominal damages, it need not consider the

10   second guidepost.  But under the third, the Court considers how the punitive damages award

11   compares to other civil penalties that could be imposed for comparable misconduct.  In Nevada

12   punitive damages awards are capped at $300,000.00 for scenarios such as this.  And because

13   Burke, in his capacity as a lawyer for TLOSHB, represented Miyayama and failed to

14   communicate with Miyayama, and because TLOSHB also accepted money from Hosoda after

15   Burke learned of Hosoda's fraud, the Court awards this punitive damages amount jointly and

16   severally.

26   ///

27   ///

28   ///

**Conclusion**

Based on these findings of fact and conclusions of law, and with good cause appearing and no reason for delay, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

- **Final judgment is entered in favor of Defendants Steven H. Burke and The Law Office of Steven H. Burke and against Plaintiff Yuichi Miyayama on Plaintiff Yuichi Miyayama's claim for aiding and abetting breach of fiduciary duty; and**

- **Final judgment is entered in favor of Plaintiff Yuichi Miyayama and against Defendants Steven H. Burke and The Law Office of Steven H. Burke, jointly and severally, on Miyayama's claims for unjust enrichment, conversion, and legal malpractice in the amount of $1; and**

- **The Court awards punitive damages in favor of Plaintiff Yuichi Miyayama and against Defendants Steven H. Burke and The Law Office of Steven H. Burke, jointly and severally, on Miyayama's claims for unjust enrichment, conversion, and legal malpractice in the amount of $300,000.00.**

The Clerk of Court is kindly directed to **ENTER FINAL JUDGMENT** accordingly.


DATED: May 29, 2025

_____
DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE